**STATE of Indiana, Appellant (Plaintiff),**

v.

**Donald J. HAINES, Appellee (Defendant).**

No. 79A02–8807–CR–283.

Court of Appeals of Indiana,
Second District.

Oct. 31, 1989.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, John H. Meyers, Pros. Atty., Lafayette, for appellant.

George G. Wilder, Chief Public Defender, Thomas J. O'Brien, Deputy Public Defender, Public Defender's Office, Lafayette, for appellee.

BUCHANAN, Judge.

## CASE SUMMARY

Appellant-plaintiff, the State of Indiana (the State), appeals from the trial court's grant of appellee-defendant Donald J. Haines' (Haines) motion for judgment on the evidence,[1] claiming that the trial judge erred in vacating the jury's verdicts of three counts of attempted murder[2] and entering judgments of conviction as to three counts of battery, a class D felony.[3] The State also alleges that the trial court erred in excluding the testimony of two physicians.

We reverse with instructions that the trial court reinstate the jury's verdict and that Haines be sentenced accordingly.[4]

## FACTS

On August 6, 1987, Lafayette, Indiana, police officers John R. Dennis (Dennis) and Brad Hayworth drove to Haines' apartment in response to a radio call of a possible suicide. Haines was unconscious when they arrived and was lying face down in a pool of blood. Dennis attempted to revive Haines and noticed that Haines' wrists were slashed and bleeding. When Haines heard the paramedics arriving, he stood up, ran toward Dennis, and screamed that he should be left to die because he had AIDS. Dennis told Haines they were there to help him, but he continued yelling and stated he wanted to f___ Dennis and "give it to him." Haines told Dennis that he would "use his wounds" and began jerking his arms at Dennis, causing blood to spray into Dennis' mouth and eyes. Throughout the incident, as the officers attempted to subdue him, Haines repeatedly yelled that he had AIDS, that he could not deal with it and that he was going to make Dennis deal with it.

Haines also struggled with emergency medical technicians Dan Garvey (Garvey) and Diane Robinson threatening to infect them with AIDS and began spitting at them. When Dennis grabbed Haines, Haines scratched, bit, and spit at him. At one point, Haines grabbed a blood-soaked wig and struck Dennis in the face with it. This caused blood again to splatter onto Dennis' eyes, mouth, and skin. When Dennis finally handcuffed Haines, Dennis was covered with blood. He also had scrapes and scratches on his arms and a cut on his finger that was bleeding.

When Haines arrived at the hospital, he was still kicking, screaming, throwing blood, and spitting at Dennis, Garvey, and another paramedic, Rodney Jewell. Haines again announced that he had AIDS and that he was going to show everyone else what it was like to have the disease and die. At one point, Haines bit Garvey on the upper arm, breaking the skin.

Roger Conn (Conn), Haines' homosexual lover and former roommate, recalled that Dr. Kenneth Pennington (Pennington) informed Haines that he had the AIDS virus. Haines told Conn that he knew AIDS was a fatal disease. Moreover, when Haines was admitted to the hospital, he repeatedly told the medical staff not to touch him because he was diseased. Haines commented to Conn, who was also at the hospital, that the medical staff was "afraid of his AIDS" because of the protective clothing that they were wearing.

Haines was charged with three counts of attempted murder. At trial, medical experts testified that the virus could be transmitted through blood, tears, and saliva. They also observed that policemen, firemen, and other emergency personnel are generally at risk when they are exposed to body products. One medical expert ob-

---

1. Ind. Rules of Procedure, Trial Rule 50.

2. Ind.Code 35-41-5-1.

3. Ind.Code 35-42-2-1(2)(A).

4. We observe *sua sponte* that reinstatement of the jury's verdict is not barred by double jeopardy principles. It is only when a defendant is *acquitted* that double jeopardy will preclude re-

trial. *State v. Lewis* (1989), Ind., 543 N.E.2d 1116; *State v. Goodrich* (1987), Ind., 504 N.E.2d 1023; *State v. Harner* (1983), Ind., 450 N.E.2d 1005. If a jury has reached a verdict of guilty which is later set aside by the trial court, the defendant is not subjected to double jeopardy inasmuch as the criminal proceedings have not yet run their full course. *State v. Keel* (1987), Ind.App., 512 N.E.2d 420.

served that Dennis was definitely exposed to the HIV virus and others acknowledged that exposure of infected blood to the eyes and the mouth is dangerous, and that it is easier for the virus to enter the blood stream if there is a cut in the skin.

Following a trial by jury, Haines was convicted of three counts of attempted murder on January 14, 1988. On February 18, 1988, Haines moved for judgment on the evidence as to the three counts of attempted murder, which the trial court granted. The trial court did enter judgment of conviction on three counts of battery as a class D felony. Haines was ordered to serve a two-year sentence on each count to run consecutively.

### ISSUES

The only issue before us is whether the trial court erred in granting Haines' motion for judgment on the evidence vacating the three counts of attempted murder.[5]

### DECISION

PARTIES' CONTENTIONS—The State maintains that the trial court erred in granting Haines' motion for judgment on the evidence because the trial judge misconstrued the requirements of proof necessary to constitute a substantial step in accordance with the law of attempt. Haines responds that his conduct did not constitute a substantial step toward murder as charged, because all evidence relating to the AIDS virus was introduced by the defense which led only to an inference in favor of Haines.

CONCLUSION—The trial court erred in granting Haines' motion for judgment on the evidence.

This appeal presents a novel question in Indiana.

We begin with T.R. 50(A) which provides in relevant part:

"Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evi-

dence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict. ..."

When the trial judge sentenced Haines on February 2, 1988, he made this statement:

"I believe my decision in this case was made easier by the State's decision to not introduce any medical expert scientific evidence. Now, I don't quarrel with that strategy. I am not the prosecuting attorney and don't want to be. It's a big job and I'm not sure I could handle it. Indeed, had I been in his shoes, given the apparent great weight of scientific evidence applicable to the facts of this case, I probably would have opted to follow that same strategy.

The State believed that the disease known as AIDS was irrelevant to its burden of proof; that only the intent or state of mind of the defendant was relevant. I disagree with that. All of us know that the conduct of spitting, throwing blood and biting cannot under normal circumstances constitute a step, substantial or otherwise, in causing the death of another person, regardless of the intent of the defendant. More has to be shown, more has to be proven, in my judgment. And the more in this case was that the conduct had to be coupled with a disease, a disease which by definition is inextricably based in science and medicine.

Now, perhaps there are medical conditions so common that a jury of lay people could assess them without the aid of expert assistance. But, certainly this disease known as AIDS does not fit into that category. Indeed it is clear that this condition is one that is in need of a great deal of medical and scientific expertise. There's no doubt in my mind had defendant been afflicted with hepatitis B, the bubontic [sic] plague, diptheria [sic] or

---

5. Because we are not reversing and remanding this cause for a new trial on the merits, we need not reach the State's second allegation of error as to whether certain testimony was properly excluded in accordance with the physician-patient privilege.

some other medical condition, evidence would have been introduced to show that people can be put in jeopardy from those diseases by the indiscriminate transmission of bodily fluids. But, of course, in this case, the State took the position that everyone has heard of AIDS; that everybody has read about the disease of AIDS; and that everyone knows that this disease can be lethal or that it is lethal; that AIDS, if you will, is as common a killer as a gun or a knife, which by their very nature are deadly weapons.

All of the medical evidence in this case was introduced by the defendant and I forced the defendant to introduce that evidence by my failure or refusal to sustain his motion for judgment of acquittal. And all of that evidence shows conclusively that the sta—— that the——this medical condition and what it means is not very clear. And this is especially true when the [u]ncontroverted evidence in this case was that the defendant did not, in fact, have what the doctors consider a AIDS [sic]; but, having instead, as set out in the charges that were filed in this case, an AIDS Related Complex, which is a preliminary stage of the disease of AIDS. And in short, *the State produced no medical or scientific evidence that the defendant actually had AIDS or that he had ARC and produced no medical or scientific evidence as to the nature of this disease known as AIDS or that of ARC; produced no evidence that ARC, as alleged, can or will meet the deadly condition of AIDS or more that AIDS is deadly—even if you have AIDS that it's deadly or, more to the point, that ARC is deadly. There was no medical expert evidence that the person with ARC or AIDS can kill another by transmitting bodily fluids as alleged in this case. And there was no medical evidence from any of the evidence that the defendant had any reason to believe that he could transmit his condition to others by transmitting bodily fluids as are alleged in this case.* As I recall, the only medical or scientific evidence *in the State's case* was the equivocal statement of Dr. Griffith, the

emergency room physician, wherein he warned the defendant that his actions endangered others. But, as I said, that statement was equivocal as I remember the evidence because there was no clear—I don't remember clearly what he—whether he was talking about the victims of this offense, the man that was with the tube in his throat that was in the room or other persons that were involved in the room.

I committed error when I overruled the defendant's motion pursuant to Trial Rule 50 at the completion of the State's case. I committed that error consciously. I let that go to—this case go to the jury consciously. But, the fact that I did so does not make it any less in error. *Looking at the evidence in this case in the light most favorable to the State and now weighing that evidence, I find that the State failed in its burden of establishing that the defendant had a medical disease of ARC as alleged, that ARC can lead to AIDS, that AIDS or ARC is a disease that can be or is lethal and that spitting, biting or throwing blood at the victims is a method of transmitting AIDS or ARC. So, there's absolutely no evidence linking those factors which I consider to be essential to the State's burden of proving a substantial step in this case. It is my decision today to correct that error.* The verdicts of the jury as to attempted murder will be set aside pursuant to Trial Rule 50 and judgment of conviction of battery on a police officer resulting in bodily injury as a Class D felony will be entered on each of the three counts. A sentence of two years will be ordered on each of the three counts. Those sentences will run consecutively because I find aggravating circumstances and I will set those out at this time."

*Record* at 699–703 (emphasis supplied).

When a trial court considers a motion for judgment on the evidence subsequent to a jury verdict, it must view *all* the evidence in a light most favorable to the non-moving party. The *trial court may enter judgment only if there is no sub-*

*stantial evidence or reasonable inference to be adduced therefrom to support an essential element of the claim. The evidence must point unerringly to a conclusion not reached by the jury* inasmuch as the evidence is *only* susceptible of favoring a judgment for the *moving* party. *Huff v. Travelers Indemnity Co.* (1977), 266 Ind. 414, 363 N.E.2d 985; *Jackson v. Warrum* (1989), Ind.App., 535 N.E.2d 1207; *Tancos v. A.W., Inc.* (1986), Ind.App., 502 N.E.2d 109, *trans. denied; Northern Indiana Pub. Serv. Co. v. Stokes* (1986), Ind.App., 493 N.E.2d 175. The trial judge is prohibited from weighing the evidence when considering whether to enter a judgment contrary to the verdict, and it is only when a verdict for the plaintiff is based on surmise, conjecture or speculation as to one or more of the necessary elements of the claim, that a judgment on the evidence for the defendant should be upheld. *Huff, supra; Tancos, supra; Senco Products, Inc. v. Riley* (1982), Ind.App., 434 N.E.2d 561; *see also Berg v. Glinos* (1989), Ind.App., 538 N.E.2d 979.

While the trial court determined that the State failed to meet its burden of proof and that it erred in initially overruling Haines' initial motion for judgment on the evidence at the conclusion of the State's case, T.R. 50(A)(6) provides in pertinent part that:

"A motion for judgment on the evidence made at one stage of the proceedings is not a waiver of the right of the court or of any party to make such motion on the same or different issues or reasons at a later stage as permitted above, except that error of the court in denying the motion shall be deemed corrected by evidence thereafter offered or admitted."

■ In light of the above, the trial judge was required to consider *all* of the evidence presented at trial in deciding whether to grant Haines' motion whether such evidence was presented by the State or the defendant. *See e.g. Pinkston v. State* (1975), 163 Ind.App. 633, 325 N.E.2d 497 (a defendant waives any error in the denial of a motion for judgment on the evidence if he chooses to present evidence). The trial judge's failure to consider all of the evi-

dence and his comment at the February 2, 1988, sentencing hearing that he *weighed the evidence* in deciding whether to grant judgment on the evidence constituted error. *See Huff, supra; Tancos, supra;* T.R. 50(A); T.R. 50(A)(6).

■ Contrary to Haines' contention that the evidence did not support a reasonable inference that his conduct amounted to a substantial step toward murder, the record reflects otherwise. At trial, it was definitely established that Haines carried the AIDS virus, was aware of the infection, believed it to be fatal, and intended to inflict others with the disease by spitting, biting, scratching, and throwing blood. *Record* at 255, 266, 268–70, 304, 319, 331–37, 347–48, 355, 371, 383, 400, 441, 474, 478, 485, 494. His biological warfare with those attempting to help him is akin to a sinking ship firing on its rescuers.

Haines misconstrues the logic and effect of our attempt statute codified as Ind.Code 35–41–5–1. While he maintains that *the State* failed to meet its burden insofar as it did not present sufficient evidence regarding Haines' conduct which constituted a substantial step toward murder, *see Appellee's Brief* at 15–16, subsection (b) of IC 35–41–5–1 provides:

"It is no defense that, because of a misapprehension of the circumstances, it would have been impossible for the accused person to commit the crime attempt."

In *Zickefoose v. State* (1979), 270 Ind. 618, 388 N.E.2d 507, our supreme court observed:

"It is clear that section (b) of our statute rejects the defense of impossibility. *It is not necessary that there be a present ability to complete the crime, nor is it necessary that the crime be factually possible. When the defendant has done all that he believes necessary to cause the particular result, regardless of what is actually possible under existing circumstances, he has committed an attempt.* The liability of the defendant turns on his purpose as manifested through his conduct. If the defendant's conduct in light of all the relevant facts

involved, constitutes a substantial step toward the commission of the crime and is done with the necessary specific intent, then the defendant has committed an attempt.

Previous Indiana cases have sometimes narrowly interpreted an attempt as conduct " 'which will apparently result in the crime, unless interrupted by circumstances independent of the doer's will.' " *Jarman v. State* (1977), [267] Ind. [202], 368 N.E.2d 1348; *Williams v. State* (1973), 261 Ind. 385, 304 N.E.2d 311; *Herriman v. State* (1963), 243 Ind. 528, 188 N.E.2d 272. However, the new statute shows that this interpretation focusing on the result of the conduct is no longer applicable and that the law now focuses on the substantial step that the defendant has completed, not on what was left undone." *Id.* at 623, 383 N.E.2d at 510 (emphasis supplied); *see also Kiper v. State* (1983), Ind., 445 N.E.2d 1353; *State v. Lewis* (1981), Ind., 429 N.E.2d 1110; *King v. State* (1984), Ind.App., 469 N.E.2d 1201, *trans. denied.*

In accordance with IC 35–41–5–1, the State was not required to prove that Haines' conduct could actually have killed. It was only necessary for the State to show that Haines did all that he believed necessary to bring about an intended result, *regardless* of what was *actually possible. See Zickefoose, supra.* Haines repeatedly announced that he had AIDS and desired to infect and kill others. At the hospital, Haines was expressly told by doctors that biting, spitting, and throwing blood was endangering others.

While IC 35–41–5–1(b) rejects the defense of impossibility, some jurisdictions provide for the dismissal of a charge or reduction in sentence on the basis of "inherent impossibility" if the defendant's conduct was so *inherently unlikely* to result or culminate in the commission of a crime, inasmuch as neither the conduct nor the action taken would present a public danger. *See e.g.* Minn.Stat.Ann. § 609.17; *People v. Elmore* (1970), 128 Ill.App.2d 312, 261 N.E.2d 736.

While we have found no Indiana case directly on point, the evidence presented at trial renders any defense of inherent impossibility inapplicable in this case. *See King v. State* (1984), Ind.App., 469 N.E.2d 1201, *trans. denied* (a defendant's intent and conduct is a more reliable indication of culpability than the hazy distinction between factual and legal impossibility).

In addition to Haines' belief that he could infect others there was testimony by physicians that the virus may be transmitted through the exchange of bodily fluids. *Record* at 547, 557, 574–75, 607. It was apparent that the victims were exposed to the AIDS virus as a result of Haines' conduct. *Record* at 611–13, 616.

Ernest Drucker (Drucker), an epidemiologist, knew of at least one case involving a health-care worker who became infected when a tube of blood containing the virus exploded, and the contaminated blood splashed on her skin and into her eyes and mouth. *Record* at 634.

In part, Drucker testified as follows:

"Q. There was—as I recall yesterday, we were—when you were talking about skin to skin contact, the emergency room nurse situation, there's one case of that type of exposure in the United States—

A. Right, that was a situation where a nurse—I think the prosecutor referred to it also in some detail, where actually no one was aware that the patient was HIV positive, I believe they'd had cardiac arrest and opened up and were being resusitated [sic] and the nurse was holding—for twenty minutes was holding a blood-soaked pad on a wound, and without wearing gloves."

*Record* at 612–13.

"Q. So with respect to the use of blood here as you've heard it in this case, you're not prepared to say it's impossible to transmit the disease—

A. No, quite the contrary. *It's possible to transmit the disease by blood—*

Q. *It is possible. And there are documented cases of that?*

A. *Absolutely.*

Q. Now when you testified previously in this case in other hearings haven't you?

A. Excuse me?

Q. I said you've testified previously in this case in other hearings haven't you?

A. Yes.

Q. And in one of those hearings, didn't you testify with respect to the cases that you described to the jury? A few minutes ago, the three healthcare workers?

A. Yes.

Q. One of those is a situation in which a vacuum tube exploded?

A. Yes.

Q. And it got into the eyes and mouth of the healthcare worker, right, and there was infection that resulted. Is that correct?

A. Well, it got into the eyes and mouth as well as onto the skin.

Q. And the other was a situation in which a nurse working in a cardiac unit had hands in blood for about twenty minutes—her hands were chapped?

A. It's believed that that—they try to find out how it could have gotten into the system and they believe it was from that exposure, so they— my hands are chapped now today also.

Q. All right. So your hands might be vulnerable too in the same way?

A. Absolutely.

Q. What was the third case? What was that about?

A. The third case was a machine, I believe, a blood separating machine that malfunctioned in some way and splattered blood on her.

A. I have that case here if you—

Q. Into the eyes and now and—

A. I'm not sure in that case if it—I can check, if you like. I have that report here.

Q. So the behavior that you've heard described here in the courtroom that was attributed to the defendant, his behavior put Officer Dennis and Dan Garvey and Rodney Jewell at real risk then. Is that correct with respect to the blood?

A. You mean the circumstances with the patient, of their being bloody themselves and—are you referring to this behavior that was described?

Q. *Well, let's take the bloody wig in the face. Put blood in their eyes and nose and mouth. That put Officer Dennis at risk, didn't it?*

A. *It certainly include—contributed to the exposure.*

Q. Well, let's not mince words. That is what happened to the healthcare worker in which the vacuum tube exploded, right, and got into the eyes and mouth?

A. Uh-huh.

Q. *So it'd raise some real possibility that Officer Dennis could be infected? Or could have been infected, is that right?*

A. *As I said before, the entire episode carries risk of exposure with it.* And it's impossible to differentiate which aspect of it contributed this way or that way more or less—scientifically, it's impossible. In other words, if someone became infected and you say—

Q. I'm not asking about proabailities [sic] at this point. I'm asking about possibilities. Right?

A. Uh-huh. Yes.

Q. *Also, with respect to the studies that you've mentioned, there are incidents of infection resulting from one time needle sticks, right?*

A. *Yes.*

Q. *And one time events?*

A. *Yes."*

Record at 633–38 (emphasis supplied).

"Q. Okay, but we've been hearing the statistic quota that there are no documented cases of police officers

or correctional people actually being infected. That doesn't matter, does it? It doesn't matter here because this man was exposed to infected blood, wasn't he, and whether he's wearing a blue uniform or an EMT's uniform or a blue suit, it doesn't matter. He's exposed. Right?

A. It matters in one very particular way in relation to the other exposures that are discussed, the possible exposures, spitting and biting and scratching and fighting and so on and that has happened multiple times with HIV positive people and corrections officers, for example, and none of those have turned— and the question of risk has arisen before and people have gotten tested before and none of those have demonstrated any infection. *The matter of blood, it doesn't matter who you are. If you or I stopped to help a person in the street who were—who'd had an accident and pulled them out of a car wreck and got blood on our hands and they were a positive person, there would be an exposure there.* It wouldn't be called an occupational exposure, but it'd be an exposure."

*Record* at 646–47 (emphasis supplied).

Paul Balson (Balson), a professor of medicine at Louisiana State, testified that infection through "skin to skin" contact is possible, and that risk of infection exists when blood is splattered into the eyes or other mucous membranes. *Record* at 571–72.

We distinguish this case from *U.S. v. Moore* (1988) (8th Cir.), 846 F.2d 1163. In *Moore,* the defendant, who had tested positive for the HIV virus, was convicted of two counts of assault with a deadly and dangerous weapon. Moore bit two correctional officers during a struggle, and the indictment charged that Moore's own mouth and teeth were the deadly weapon. On appeal, Moore's convictions were affirmed, and the court concluded that the evidence was sufficient to support a finding that Moore's mouth and teeth were deadly weapons inasmuch as he used them to inflict serious bodily harm—even if he was not infected with the HIV virus.

However, the court emphasized that the *evidence of record* was insufficient to establish that AIDS could be transmitted by a bite. Unlike the testimony presented by Drucker and Balson, the *only* evidence relating to AIDS transmission in *Moore* was elicited from a physician who testified that he knew of no "well-proven instances in which a human bite has resulted in transmission of the virus to the bitten person." *Id.* at 1165. The doctor also agreed with a medical journal which concluded there was no evidence that AIDS could be transmitted through any contact not involving an exchange of body fluids.

From the evidence in the record before us we can only conclude that Haines had knowledge of his disease and that he unrelentingly and unequivocally sought to kill the persons helping him by infecting them with AIDS, and that he took a substantial step towards killing them by his conduct believing that he could do so, all of which was more than a mere tenuous, theoretical, or speculative "chance" of transmitting the disease. From all of the evidence before the jury it could have concluded beyond a reasonable doubt that Haines took a substantial step toward the commission of murder.

Thus, the trial court improperly granted Haines' motion for judgment on the evidence contrary to T.R. 50(A). The trial court's judgment is reversed with instructions to reinstate the jury's verdict and resentence Haines accordingly.

SHIELDS, P.J., concurs.

SULLIVAN, J., concurs in result.