Curtis WEEKS, Appellant,

v.

STATE of Texas, Appellee.

No. 11–90–045–CR.

Court of Appeals of Texas, Eastland.

July 9, 1992.

Discretionary Review Refused Oct. 14, 1992.

John E. Wright, John E. Malone, Malone & Wright, Huntsville, James Randal Smith, Michael B. Charlton, Houston, Curt P. Beck, David J. Healey, Weil, Gotshall & Manges, New York City (Amicus Curiae), for appellant.

B.N. (Tuck) Tucker, Jr., Asst. Special Prosecutor, Special Prison Prosecution Unit, David P. Weeks, Crim. Dist. Atty., Walker County Courthouse, Travis McDonald, Special Prosecutor, Special Prison Prosecution Unit, Huntsville, for appellee.

## OPINION

McCLOUD, Chief Justice.

The jury convicted appellant of attempted murder. After finding that appellant had two prior felony convictions, the jury assessed punishment at confinement for life. We affirm.

Appellant has briefed five points of error, arguing that: (1) he has not been provided with a complete record on appeal; (2) the evidence is insufficient to support the verdict; (3) the jury instructions were fundamentally defective; (4) the trial court heard arguments and made rulings in appellant's absence; and (5) the trial court made improper comments during voir dire.

We will first address the challenge to the sufficiency of the evidence.

At the time of the offense, appellant had tested positive for the human immunodeficiency virus (HIV), the virus which causes acquired immune deficiency syndrome (AIDS). He was convicted of attempted murder by spitting on a prison guard.[1]

■ Appellant argues specifically that the State did not prove that his conduct was reasonably capable of harming the complainant and that the State totally failed to prove either that there was any virus present in appellant's saliva or that the possibility of transmission was reasonably likely. It is appellant's position that he can not be convicted of attempted murder unless the evidence demonstrates that he had the capability of completing the act at the time the offense took place.

■ In order to determine if the evidence in this case is sufficient, this court must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Ransom v. State,* 789 S.W.2d 572, 577 (Tex.Cr.App. 1989), *cert. den'd,* 497 U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990).

The record reflects that on June 7, 1988, appellant was being transferred from the Coffield Prison Unit to the Ramsey Prison Unit. He was cursing loudly and complaining about the restraints that had been placed on him. After a stop at the Diagnostic Center to change drivers and feed appellant, the transfer continued. Appellant tore a panel off of the door of the van and the headliner from the roof of the van. Appellant said that he was going to "dog" the officers and that he was "going to cut one of the boss' heads off." Appellant was placed on the ground and further restrained. He yelled and cursed at the officers.

Once he was placed back in the van, appellant continued to curse and threaten the officers, and he banged his head against the wire mesh in the van. Officer Raymond David Moss testified that appellant stated that he was "going to take somebody with him when he went," that he was "medical now," and that he was "HIV–4."

Appellant spit twice in the face of the complainant, a prison guard. The complainant testified that, both times appellant spit on him, appellant's saliva covered the complainant's glasses, his lips, and his nose. The saliva went up into his nose, but the complainant was uncertain as to whether any of appellant's saliva went into his mouth.

The complainant testified that, when appellant stated he was "HIV–4," appellant was looking directly at the complainant. The complainant stated that appellant told everybody that he had AIDS and that he was going to take as many with him as he could. The complainant believed that appellant intended to kill him.

■ Under TEX.PENAL CODE ANN. § 15.-01(a) (Vernon Supp.1992), the essential elements of an attempt offense are that: a person, with specific intent to commit an offense, does an act amounting to more than mere preparation that tends, but fails, to effect the commission of the offense intended. See *McCravy v. State,* 642 S.W.2d 450 (Tex.Cr.App.1982). To prove attempted murder, it is sufficient to show that the accused had the intent to cause the death of the complainant and that he committed an act, which amounted to more than mere preparation, that could have caused the death of the complainant but failed to do so. *Flanagan v. State,* 675 S.W.2d 734 (Tex.Cr.App.1984). The State was required to prove that appellant's intent, when he spit on the officer, was to cause the officer's death; that appellant was infected with HIV at the time he spit on the officer; and that this act was more than mere preparation which tended, but

---

**1.** Effective September 1, 1989, subsequent to the date of the offense in question, the Texas Legislature passed TEX.PENAL CODE ANN. § 22.012 (Vernon Supp.1992), creating the offense of intentionally exposing another person to AIDS or HIV.

failed, to effect the commission of the offense intended, which was the officer's death.

 It is undisputed that appellant spit twice on the officer and that appellant was infected with HIV at the time. The record reflects that appellant believed he could kill the complainant by spitting his HIV infected saliva on him. The issue, then, before this court is whether sufficient evidence, when viewed in the light most favorable to the verdict, was presented to the jury showing that appellant could have transmitted HIV by spitting on the officer.[2]

Mark E. Dowell, M.D., a doctor of infectious diseases at Baylor College of Medicine; Paul Drummond Cameron, Ph.D., Chairman of the Family Research Institute; Albert D. Wells, D.D.S., a dentist employed by the Texas Department of Criminal Justice at the Coffield Prison Unit; and Lorraine Day, M.D., an orthopedic surgeon employed by the University of California at San Francisco and Chief of the Orthopedic Department at San Francisco General Hospital, testified on behalf of the State. Dr. Dowell, Dr. Cameron, and Dr. Day qualified as experts on HIV. Dr. Dowell and Dr. Wells had treated appellant and other HIV positive patients. Dr. Richard B. Pollard, Professor of Internal Medicine and Microbiology at the University of Texas Medical Branch at Galveston and Director of the Diagnostic Virology Laboratory at the University of Texas, testified as an HIV expert on behalf of appellant. The State's experts and appellant's expert disagreed on whether HIV could be transmitted through saliva. All four experts on HIV were vigorously cross-examined. The testimony will now be reviewed in the light most favorable to the jury's verdict. See *Jackson v. Virginia,* supra; *Ransom v. State,* supra.

Dr. Dowell testified that there have been studies to determine if HIV would grow in saliva. In one study, the virus developed in 3 out of 55 instances. Dr. Dowell stated that a certain number of HIV-positive patients will have HIV growing in their saliva at any given time. Dr. Dowell testified that, while the probability of infection increases with the frequency of exposure, a "one-shot deal" could transmit the virus.

Dr. Dowell stated that "[t]he possibility is low but certainly not zero" that HIV could be transmitted by spitting. If blood were in the saliva, the chances of the HIV infection being in the saliva and the chances of spreading the infection through saliva would increase. In addition, he testified that, if the saliva went into the victim's nose or on the victim's lips, the likelihood of acquiring the virus would be a little bit higher. Dr. Dowell testified that it has never been proved that HIV could not be transmitted through saliva.

Dr. Dowell stated that neither did he conduct tests on the saliva spit on the officer nor did he test appellant's saliva to see if it contained HIV. Dr. Dowell testified that he had seen one report which indicated that there was some "inhibitor" effect of saliva to HIV in some patients but the effect was not "mainstream." In addition, he testified that the medical community is uncertain as to whether HIV could or could not be transmitted through saliva.

Dr. Cameron testified that "a goodly amount" of his time was devoted to literature research. He reviewed and critiqued various articles dealing with AIDS. Dr. Cameron testified that he was an AIDS expert in general and an expert in how AIDS is spread.

2. The American Civil Liberties Union, the Dallas Gay Alliance, the Texas Human Rights Foundation, and the Greater Houston American Civil Liberties Union urge this court, in an amici curiae brief, to take judicial notice, pursuant to TEX.R.CRIM.EVID. 201, "that it is impossible to transmit the virus which causes AIDS by spitting." Rule 201(b) provides that:

 A judicially noticed fact must be one not subject to reasonable dispute in that it is ...

 capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

 Many of the AIDS experts express the opinion that it is impossible to transmit HIV through saliva. However, this has not been conclusively established and is not free from reasonable dispute. Accordingly, this court can not take judicial notice of the matter urged.

Based upon current literature, Dr. Cameron testified that it definitely seemed possible that HIV could be transmitted through saliva. Dr. Cameron testified that the background papers for the National Research Council document entitled "AIDS, Sexual Behavior and Intravenous Drug Use" showed that the scientists who did the research agreed that there were at least two clear, unequivocal cases of salivary transmission. In addition, Dr. Cameron stated that there were a number of cases where homosexuals who had allowed only oral sex to be performed on them became infected and that the mode of transmission would have been saliva. Furthermore, he testified that there were a number of cases in the Soviet Union where HIV-infected children passed the virus to their mothers through their saliva during breast-feeding. In the October 1989 issue of the *Journal of the American Medical Association,* a case was reported where an elderly woman infected her elderly husband through kissing.

Dr. Cameron testified that there was a great deal of uncertainty about how AIDS is transmitted but that most experts agree that there has been approximately ten cases of transmission through saliva. Dr. Cameron's opinion was that a person could become infected with HIV by being spit on. The degree of probability of infection depends upon where the saliva landed. Dr. Cameron testified that it was theoretically possible for a person with the HIV infection to pass the infection by spitting on the unbroken skin of another. In addition, the chances of passing the virus increases depending upon the stage of the HIV infection, with HIV–3 being more contagious than HIV–2. Dr. Cameron testified that it is common for people with HIV–3 and HIV–4 infections to have gum diseases and bleeding gums and that the presence of blood in saliva increases the likelihood of the infection being passed through saliva. It was Dr. Cameron's opinion that the nasal cavity would be "an exceptionally bad place" for contact with HIV-infected saliva because the body's only defense would be to expel or blow out the virus.

Dr. Wells testified that in April of 1988 he examined appellant and that appellant had tartar on his teeth, which irritates the gums. Tartar would tend to cause blood to be in the saliva. Furthermore, Dr. Wells testified that it was his experience that HIV-positive patients have more gingivitis, an irritation of the gums.

Dr. Day testified that she was a member of the San Francisco General Hospital AIDS Committee, a member of the California Chancellor's AIDS Committee, and a member of the AIDS Task Force for the American Academy of Orthopedic Surgeons. Dr. Day stated that San Francisco General Hospital is one of the premier hospitals in the country for the treatment of AIDS patients and that she has operated on as many AIDS or HIV-infected patients as any doctor in the country. At times as many as 90 percent of her patients have been HIV positive.

Dr. Day testified that the virus is present in saliva. She cited several documented cases of saliva transmission of the HIV virus: a five-year-old boy who infected his brother by either "household contact" or by a bite which did not break the skin; two men who "got the virus transmitted through saliva from their partner, not through semen, but through saliva"; an elderly couple who transmitted the virus only through kissing; and Russian babies who infected their mothers through their saliva while breastfeeding.

Dr. Day stated that there is often blood in saliva, that blood is also a source of transmission, and that the presence of blood would raise the content of HIV in the saliva and increase the risk of transmission. Dr. Day described the results of an Italian study where 50 percent of the people who participated had blood in their saliva after eating. The record reflects that appellant was provided lunch shortly before the incident.

Dr. Day testified that HIV could be transmitted through the mucous membranes of the vaginal tract, the rectal tract, the mouth, and the nose. Dr. Day testified that, as the HIV infection moves from

Stage 1 or 2 up to Stages 3, 4, 5 and 6, the amount of HIV present increases.

Dr. Day testified that appellant's medical records show that he was "HIV–4" a week before he spit on the officer. Dr. Day stated that the medical records showed that appellant had gingivitis and that, therefore, there was a much higher chance he had blood in his mouth and his saliva. In addition, the records showed that appellant had had nausea, vomiting, diarrhea, and fevers near the time of the incident, increasing the chances that appellant may have had lesions in his mouth or blood in his saliva. Dr. Day testified that it was possible that the complainant could contract HIV if appellant spit his saliva onto the complainant's face. If appellant's saliva entered the complainant's nose, the complainant's chances of contracting HIV would increase according to Dr. Day.

Dr. Day began researching AIDS on her own when she discovered that some of the information regarding the transmission of AIDS was wrong. Dr. Day admitted that she has not specialized in internal medicine and has not had any formal training in infectious diseases. However, she had performed original laboratory research on the transmission of AIDS. In response to questions about the case at hand, Dr. Day stated that she could not say for sure that the actual saliva spit on the officer contained HIV. Dr. Day testified that she did not know of a case where HIV was transmitted by one person spitting on another. However, Dr. Day noted that she did not think that "they're looking for spitting cases."

Dr. Pollard testified that he was board certified in internal medicine and that he specialized in infectious diseases. Dr. Pollard had 11 years of training and experience in the area of virology. He directed a research program active in both clinical and scientific research focused upon infections with HIV. Dr. Pollard testified that he sat on a national panel which looks at all the drug studies conducted by the National Institute of Health for the treatment of AIDS infections.

Dr. Pollard stated that it had never been proved that HIV could be transmitted by saliva being spit on another. Dr. Pollard's opinion was that it was extremely remote, if not impossible, for HIV to be transmitted by spitting. Dr. Pollard was unaware of anyone acquiring HIV as the result of contact with only saliva.

Dr. Pollard testified that HIV is present in saliva but in very small quantities and that the HIV which is present in saliva is actually inactive. Dr. Pollard stated that anything is theoretically possible but that the chance of transmitting HIV through saliva is the lowest in theoretical possibility. Dr. Pollard stated:

In my opinion, if [HIV] was transmitted by casual contact with saliva or with kissing, we would have many more documented cases than we do now.... We would have seen an explosion outside the risk group, which has not happened.

Dr. Pollard questioned the Russian cases where infants infected their mothers by breast-feeding and stated that he did not believe the cases were documented well enough to provide reliable information. Concerning the case where the only sexual contact between the elderly couple involved kissing, Dr. Pollard testified that "it's difficult to get all the information about the sexual practices and sexual contact" and that he did not "think it serves as a precedent for transmission in general." In response to questions addressing the case where one sibling allegedly passed HIV to another without breaking the skin, Dr. Pollard testified that a bite involves injury to cells and tissue which is a different situation than only saliva contacting the skin. It was Dr. Pollard's opinion that one was much more likely to contract HIV through a bite than through HIV-infected saliva spit into the mucous membranes of the nose. He reasoned that the trauma involved in a bite would be more likely to transmit the infection because the natural barriers involved with intact skin would be damaged. It was Dr. Pollard's opinion that skin provides protection against many infectious agents.

The jury, as the trier of fact, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Williams v. State,* 773 S.W.2d 525 (Tex.Cr.App.1988); *Flanagan v. State,* supra. The jury chose to believe the witnesses who testified that HIV could be transmitted through saliva. If a rational trier of fact could have reached that result based upon the evidence in this particular case, it would be improper for this court to set aside the jury's verdict. While the evidence was highly controverted, there is sufficient evidence in the record, when considered in the light most favorable to the verdict, that appellant could have transmitted HIV by spitting. Appellant's second point of error is overruled.

■ In his first point of error, appellant complains that he has not been provided with a complete record on appeal. Appellant contends that there was a hearing held in "Madisonville" before a "Judge Ernst" prior to the date of trial and that the records of that hearing are not included in the record on appeal. Specifically, appellant cites a brief discussion in the statement of facts on the merits relating to a prior hearing in Madisonville.

The record does not reflect that appellant requested that the records from the "Madisonville" hearing be included on appeal. Appellant has the burden to present a sufficient record to establish error requiring reversal. TEX.R.APP.P. 50(d). Appellant has failed to show that, through no fault of his own, he was deprived of a portion of the statement of facts. See *Dunn v. State,* 733 S.W.2d 212 (Tex.Cr.App.1987). This point is overruled.

■ In his third point of error, appellant argues, for the first time on appeal, that the charge "totally omitted" an element of attempted murder: that the act of spitting tended to but failed to commit the offense of murder. We disagree.

The trial court instructed the jury as follows:

A person commits an offense if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails, to

effect the commission of the offense intended. Such is an *attempt* to commit an offense.

\* \* \* \* \* \*

Now, if you find from the evidence beyond a reasonable doubt that on or about the 8th day of June, 1988, in Walker County, Texas, the defendant, Curtis Weeks, did *attempt* to cause the death of [complainant] with specific intent to kill [complainant], by intentionally spitting on the said [complainant], while defendant was infected with Human Immunodeficiency Virus, and you further find beyond a reasonable doubt that the defendant, in so acting, was not acting under the immediate influence of sudden passion arising from an adequate cause, then you will find the defendant guilty of attempted murder, as charged in the indictment. (Emphasis added)

The trial court properly charged the jury on all the elements of attempted murder. See McCLUNG, JURY CHARGES FOR TEXAS CRIMINAL PRACTICE (INDICTMENTS AND INFORMATIONS) 28 (rev. 1992). The third point is overruled.

■ Next, appellant contends that the trial court erred by hearing arguments and by ruling on motions in appellant's absence. Specifically, appellant refers to a pre-trial hearing where various motions were being presented. After denying a motion to take judicial notice of facts, the trial court stated, "I guess we need to get him in here if we're ruling on motions." Appellant argues that there is nothing in the record to show that he was present when any of the pre-trial motions were argued and ruled on.

No objection was made in the trial court. The record does not establish that appellant was absent. Moreover, the motions dealt with questions of law. The court in *Guerra v. State,* 760 S.W.2d 681 (Tex. App.—Corpus Christ 1988, pet'n ref'd), stated:

While Tex.Code Crim.Proc.Ann. art. 33.03 (Vernon Supp.1988) requires that a defendant be personally present at the trial, the absence of the defendant when only questions of law are considered in

chambers will not cause reversal unless the presence of the defendant bears "a reasonably substantial relationship to the opportunity to defend." *Mares v. State*, 571 S.W.2d 303 (Tex.Crim.App.1978). As in *Mares*, the appellant's absence occurred when only questions of law were considered.

See also *Aguero v. State*, 818 S.W.2d 128 (Tex.App.—San Antonio 1991, pet'n ref'd). Furthermore, we hold that beyond a reasonable doubt the error, if any, made no contribution to the conviction or punishment. Tex.R.App.P. 81(b)(2). The fourth point is overruled.

■ In his final point of error, appellant contends that the trial court's remarks were improper comments on his guilt and on the weight of the evidence. Appellant argues that the trial court "told" the jury panel that appellant had committed the alleged offense. We disagree.

The record reflects that two panels of prospective jurors were questioned. During the voir dire of the second panel, the trial court stated:

> Now, to give you a little idea of what's going on, right now at this point you are an alternate. We may or may not reach you as far as the jury goes; but in the event that we do, we need to tell you a little bit about it and inquire a little bit about your feelings.

> \* \* \* \* \* \*

> The indictment alleges that on the date charged back in 1988, the 8th day of June, with the intent to commit the offense of murder of an individual, a person by the name of [Complainant]—I think the evidence will show he's a guard. Does anybody know him?

The trial court then spent a brief period of time responding to a request for a hearing from appellant's attorney. Immediately thereafter, the trial court made the following statement:

> The defendant, Curtis Weeks, back on the 8th day of June, 1988, while allegedly infected with the HIV, did commit an act of more than mere preparation that tended but failed to effect the commission of the offense of murder by spitting on a

person that I feel the evidence will show the person is named [Complainant]. Does anybody know [Complainant]?

The record clearly reflects that the trial court was informing the prospective alternate jurors of the charges against appellant and that the court was trying to determine if any of the prospective alternate jurors knew the complainant. No objection was made to the comments. *Sanchez v. State*, 434 S.W.2d 133 (Tex.Cr.App.1968). See also *Osteen v. State*, 642 S.W.2d 169 (Tex.Cr.App.1982). Moreover, the record does not reflect that any members of the second panel served as jurors. The fifth point is overruled.

The judgment of the trial court is affirmed.