844 So.2d 263 (2003)
STATE of Louisiana
v.
Johnnie ROBERTS, Jr.
No. 2002-KA-2520.
Court of Appeal of Louisiana, Fourth Circuit.
March 26, 2003.
*264 Eddie J. Jordan, Jr., District Attorney, Donna R. Andrieu, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge TERRI F. LOVE, Judge DAVID S. GORBATY.
TERRI F. LOVE, Judge.
Defendant was convicted of forcible rape, intentional exposure to the AIDS virus, and second degree kidnapping, and sentenced to life imprisonment without benefits of probation or suspension of sentence as a fourth offender on the forcible rape conviction. He was also sentenced to ten years at hard labor for the intentional exposure to AIDS virus conviction and forty years at hard labor without benefits of parole, probation or suspension of sentence on the second degree kidnapping conviction to be served concurrently with the forcible rape sentence. On appeal the appellant alleges the State failed to provide sufficient evidence to support the appellant's conviction. For the reasons assigned below, we affirm the defendant's conviction and sentence.
*265 STATEMENT OF CASE
On December 3, 2001, the State filed a bill of information charging the appellant with one count each of forcible rape, intentional exposure to the AIDS virus, and second degree kidnapping. At his arraignment, he pled not guilty to all counts. On March 12, 2002, at the conclusion of a two-day trial, a twelve-person jury found him guilty as charged to all three counts. The State filed a multiple bill, and the court found him to be a fourth offender. The defendant filed a motion for a sanity hearing, but later he withdrew this motion and indicated his readiness for sentencing. The court sentenced him on the rape count to life imprisonment without benefit of probation or suspension of sentence as a fourth offender, to ten years at hard labor on the exposure count, and to forty years at hard labor without benefits of parole, probation, or suspension of sentence on the kidnapping count. The court ordered the sentences to run concurrently. The court granted a motion for appeal on that date; no motion for reconsideration of sentence was filed. This appeal followed.
FACTS
In the early morning hours of September 18, 2001, police officers responded to a call of a woman who had been kidnapped and raped and was currently at a residence in the 1400 block of Shirley Drive in Algiers. Officers responding to the call found the victim S.M.[1]. The officers eventually took her to Charity Hospital, where a rape examination was performed on her. Kate Palisi, the nurse who conducted the examination and who was qualified as an expert in the examination and treatment of alleged sexual assault victims, testified that S.M. arrived at the hospital with abrasions and bruises, including what appeared to be a bite mark on her right shoulder. She also had abrasions on the inside of her mouth and on her left cheek. Nurse Palisi testified that S.M. told her that she had been standing in front of her house when a man drove up and forced her into his car. He locked the doors and hit her when she tried to get away. S.M. told her the man took her to an Algiers park and raped her anally and vaginally. Nurse Palisi testified her examination of S.M. showed no trauma or injury to her anal or vaginal area, but she noted it is not uncommon for a victim of such an assault to have no trauma or injury. She testified there was no visible semen in the victim's vaginal vault, but S.M. indicated to her that she was not sure if the assailant ejaculated. Nurse Palisi testified the victim told her she had last had sexual relations the evening before the rape. She also testified the victim had delivered a child in the past.
Heather Close testified she lived in the 1400 block of Shirley Drive on the night of the rape. She testified that at approximately 1:30 a.m. she heard someone run onto her front porch and begin pounding on her front door. She stated she heard a woman yelling for help. She testified her large dog began barking, and she did not open the door for the woman because the dog was very protective. Instead, she called 911. She testified the woman left her porch, and when she looked outside she could see wet footprints of bare feet on her porch. The State played the 911 tape of Ms. Close's call.[2]
Ashley Harding testified she also lived in the 1400 block of Shirley Drive. She testified that on the morning of the rape she was watching television with her husband when they heard noises and her dog barking at the back of their house. She *266 testified her husband went to the back of the house, then came back through the house to the front and told her to call 911. She stated that after he went out the front door, S.M. ran inside her house through the door. She testified the victim had a bloody lip and blood all over her body, and some hair had been ripped from her head. In addition, she was wearing only a shirt with a ripped collar. Ashley Harding gave the victim a pair of shorts to wear and tried to clean her a bit. Ashley Harding described the victim as shaking, crying, and screaming. The victim told her she was standing on Holmes Boulevard in Terrytown when a man grabbed her, put her in a car, and took her to Behrman Stadium, where he raped her in a field behind the stadium. Ashley Harding testified the victim did not tell her the assailant's name. She further stated the police and S.M.'s mother arrived at the house soon thereafter. She estimated the victim was at her house for thirty to forty-five minutes. Ashley Harding denied knowing either the victim or the defendant prior to this incident. The State also played the 911 tape of Ashley Harding's call.[3]
Scott Harding testified he is Ashley Harding's husband. He testified that Behrman Stadium was located behind his house. He testified that on the night of the rape, he and his wife heard noises at the back of their house. He stated he went to the back yard, but he determined that someone was in the front of his neighbor's house. He went back through his house to the front and saw the victim beating on the front of his neighbor's house. He stated that when the victim saw him standing outside the front of his house, she came over to him from his neighbor's porch. He testified she was dressed only in a torn shirt, she had a bruised and bleeding Hp, and some of her hair had been pulled out. He testified she told him she had been raped and asked for his help. He took her inside his house and told his wife to call 911. He then went back outside, leaving the victim and his wife in the house. He stated he did not know the victim or the defendant prior to this incident.
Barbara Winsberry testified she lived in the 1300 block of Shirley Drive. She stated that on the night of the rape she heard someone screaming and called 911. She stated she did not see who was screaming. The State played the tape of her call to 911.[4]
Robert Pender testified he was the victim's boyfriend at the time of this incident. He stated he lived with her, her mother, and her son at a residence on Holmes Boulevard in Terrytown. He admitted having one prior conviction for auto theft. He stated on the night of the rape, he came home from work at approximately midnight. He stated that after staying a short while, he left to go to a store. When he returned approximately an hour later, S.M. was missing. He stated he and the victim's mother waited a while and then canvassed a few neighbors to see if S.M. were visiting them, but their efforts were in vain. Some time later, they received a phone call telling them were the victim was located. He testified they went to a house in Algiers where they met her. He described the victim as bloody and beaten, with a bite mark on her back. He maintained he and the victim never fought, and he denied ever hitting her. He testified he and the victim had sexual relations approximately a week before this incident. He denied knowing the defendant.
*267 The victim's mother testified the victim was seventeen years old at the time of trial, and the victim had a two-year-old son. She testified she, the victim, the victim's son, and Robert Pender lived together in Terrytown. She stated that on the night of the rape, she and her grandson had gone to bed, and the victim and Robert Pender were watching videos downstairs. She stated that at some point, Robert Pender woke her and told her the victim was missing. She testified she got dressed and helped him look for the victim, and finally they received a phone call telling them the victim's location. She testified she and Robert Pender drove to a residence on Shirley Drive in Algiers, and at first the police would not let her enter to see her daughter. Eventually her daughter came out of the house, and she noticed the victim's shirt was torn, her hair had been pulled, and she had been beaten. She further testified that the police took the victim to the police station and then to Charity Hospital. After they released the victim, she drove the victim home.
The victim's mother testified the victim told her the name of her assailant was Johnnie Ray Roberts. Based on this information, she went to the DMV and told the personnel there a story about someone having stolen her husband's license plate. She convinced someone to look up the name in the computer, and the search revealed the photographs of four men with that name. She went back home and picked up the victim, and the two women returned to the DMV. When the victim viewed the photographs, she chose the photograph of the defendant Johnnie Ray Roberts. The victim's mother then called 911 and reported the defendant's name and address. She testified she went to that address, but the defendant was not there. She stated she then went home and called the Jefferson Parish police. She stated she later told officers from the N.O.P.D. that she had gotten the defendant's name and address off of the Internet. She testified officers eventually came to her house to show her daughter a photographic lineup. She denied knowing the defendant.
S.M. testified that on the night of the rape Robert Pender left for the store soon after coming home from work. She testified she stayed inside for a while waiting for him to return, but at some point she went outside to wait for him on the corner, which was right in front of her house. She stated that as she was standing outside, a champagne-colored Cadillac pulled up and the driver pushed her into the car. She identified that man as the defendant, whom she insisted she did not know before this incident. She testified that after he put her in the car, the defendant locked the doors and drove off toward Algiers. She stated she did not try to get out of the car because she could see he was holding down the lock switch. She testified he punched her in the face five or six times and then stopped the car in a park. He ordered her to get in the back seat and hit her. When she complied, he joined her there. She testified he ordered her to get on her knees, and he removed her shorts and underwear. He raped her anally, and then moved her around and raped her vaginally. She testified that at some point, she told him she had to go to the bathroom, and her ordered her to do so outside the car. She testified she left the car, wearing only a shirt, and acted like she was preparing to go to the bathroom. Instead, she jumped up and started running. She testified he grabbed her by the shirt and hit her in the face, and she hit him back and grabbed him between his legs. He let go, and she again began running, but he caught her again and bit her on her back. She resisted, and eventually he let *268 her go and returned to his car, while she ran away. The victim testified she knocked on the doors of three or four houses before someone let her in. She testified she was given a pair of shorts to wear. The people who sheltered her called the police and her mother.
S.M. testified that while she was in the car she noticed a temporary license plate with the defendant's name on it. She testified she did not remember if she told the officers who responded to the call that name, but she stated she gave the name to the officer who took her to Charity for her examination. She stated she also told her mother the name when they got home. She admitted she told the nurse at the hospital that her assailant was unknown. She estimated her mother was gone approximately half an hour before she returned and took her to the DMV. The victim testified she later chose the defendant's picture from a photographic lineup. She admitted she viewed the lineup after having seen the defendant's picture at the DMV. She denied knowing the defendant prior to this incident and denied giving him permission to have sex with her. She positively identified the defendant in court as the man who kidnapped and raped her.
Sgt. Bossetta, of the NOPD, testified he compiled a photographic lineup containing the defendant's picture and showed it to the victim later on the date of the rape. Det. Baudier testified that the defendant's 1989 tan/champagne Cadillac was found some days after the incident in another part of town. He testified he had obtained a search warrant for the car, but by the time he was notified that the car had been found, it had been parked for a while with its windows down. He testified he did not order the crime lab to process the car, because the car had been sitting with its windows open, and the integrity of any evidence in the car would have been compromised.
The parties agreed to three stipulations. First, it was stipulated that the defendant pled guilty in Jefferson Parish in 1998 to the intentional exposure to the AIDS virus, having bitten the victim in that case in a fight. The second stipulation was that the rape kits from the examination of the victim were negative for seminal fluid. The third stipulation was that the spot of blood found on the victim's shirt was DNA-tested and found to be positive for the victim and negative for the defendant.
ERRORS PATENT
A review of the record for errors patent reveals one potential one. When imposing sentence on the forcible rape count, the court ordered the life sentence to be imposed without benefit of probation or suspension of sentence; the court specifically did not prohibit parole eligibility because it believed the provisions for multiple offenders do not prohibit parole eligibility. However, La. R.S. 15:529.1 A(1)(c)(ii) provides in part that where the present offense and at least two of the prior offenses are crimes of violence as defined by La. R.S. 14:2(13), the defendant shall be sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence.
The appellant's present offense was forcible rape, and two of his prior offenses according to the multiple bill were armed robbery and another count of the intentional exposure to the AIDS virus, all three of which are defined as crimes of violence by La. R.S. 14:2(13). Thus, the trial court erred by not specifying that the sentence be served without benefit of parole. However, as per La. R.S. 15:301.1 *269 A[5], in instances where the statutory restrictions are not recited at sentencing, they are included in the sentence given, regardless of whether or not they are imposed by the sentencing court. Furthermore, in State v. Williams, XXXX-XXXX (La.11/28/01), 800 So.2d 790, the Louisiana Supreme Court held that section A of the statute self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence, which may result from the failure of the sentencing court to impose punishment in conformity with that provided in the statute. Hence, this court need take no action to correct the trial court's failure to specify that the defendant's sentence be served without benefit of parole, because the correction is statutorily effected.
ASSIGNMENT OF ERROR
By his sole assignment of error, the appellant contends the State failed to present sufficient evidence to support his conviction for intentionally exposing the victim to the AIDS virus. Specifically, he argues the evidence failed to prove beyond a reasonable doubt that the victim was actually exposed, that he had the intent to expose her, or that his teeth were "AIDS" contaminated objects.
The test for determining the sufficiency of evidence to support a conviction was set forth in State v. Armstead, XXXX-XXXX, pp. 5-6 (La.App. 4 Cir. 11/6/02), 832 So.2d 389, 393-394:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If *270 rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d 1305; Green, 588 So.2d 757. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319, 1324 (La.1992).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
The appellant was convicted of the intentional exposure to the AIDS virus, which is defined in pertinent part by La. R.S. 14:43.5:
A. No person shall intentionally expose another to any acquired immunodeficiency syndrome (AIDS) virus through sexual contact without the knowing and lawful consent of the victim.
B. No person shall intentionally expose another to any acquired immunodeficiency syndrome (AIDS) virus through any means or contact without the knowing and lawful consent of the victim.
* * *
D. For purposes of this Section, the following words have the following meanings:
(1) "Means or contact" is defined as spitting, biting, stabbing with an AIDS contaminated object, or throwing of blood or other bodily substances.
The appellant first argues the evidence was insufficient to support his conviction for the intentional exposure to the AIDS virus because the victim could not tell if her assailant ejaculated, and there was no presence of seminal fluid in her rectal area or her vaginal vault. He theorizes that these factors show that there was not an exchange of bodily fluids, which would have resulted in the exposure of the victim to the AIDS virus. However, the facts that the victim could not state whether or not the appellant had ejaculated and that there was no seminal fluid present hours after the rape does not necessarily mean that at the time of the rape no bodily fluids were exchanged. Most tellingly, the appellant does not argue that the State failed to prove a rape had occurred. Indeed, the victim testified the appellant vaginally and anally raped her, and the nurse who examined her at the hospital testified that it was not unusual for a rape victim not to exhibit any trauma in the area of a rape. Thus, contrary to the appellant's first argument, the appellant's conviction can stand merely upon his rape of the victim under La. R.S. 14:43.5(A).
The appellant next argues at some length that his conviction cannot stand because the State presented no evidence that his biting the victim exposed her to the AIDS virus. He cites to two cases from *271 Louisiana, State v. Gamberella, 633 So.2d 595 (La.App. 1 Cir.1993), and State v. Serrano, 97-0923 (La.App. 4 Cir. 6/17/98), 715 So.2d 602, where defendants' convictions for La. R.S. 14:43.5 were upheld, and in each case the State presented expert medical testimony concerning the exposure to the AIDS virus.[6] He contends that because the State here did not present scientific evidence that the AIDS virus can be passed through biting, the State failed to present sufficient evidence. He argues that the State failed to show his teeth were "AIDS contaminated objects." However, by its very provisions, La. R.S. 14:43.5 defines the act of exposure to the AIDS virus as including "through any means or contact," which is further defined in subsection D(1) as "spitting, biting, stabbing with an AIDS contaminated object, or throwing of blood or other bodily substances." The statute does not mandate that the State prove that the biting is with an "AIDS contaminated object;" rather it defines the means or conduct as, among other things, biting, or by stabbing with an AIDS contaminated object. The appellant's interpretation, that the biting must be with an AIDS contaminated object, is not reasonable because such interpretation then would also mandate that the spitting, which precedes biting in the list of subsection D(1), would also have to be with an AIDS contaminated object, and such interpretation are not logical. The fact remains the parties stipulated that the defendant had a prior conviction for the intentional exposure to the AIDS virus, and he bit the victim.
The appellant further contends that the State failed to prove he exposed the victim to the AIDS virus by biting her because the State failed to prove that the bite broke the victim's skin.[7] At trial, Nurse Palisi testified that the victim had a bruised and abraded area on her shoulder that appeared to be a bite mark. The appellant points to the victim's medical record, which indicates that the abrasion was "without bleeding" when Nurse Palisi examined her. However, Nurse Palisi examined the victim some time after the attack, and it is possible that the notation "without bleeding" meant that the abrasion was not actively bleeding at the time of the examination. The State presented evidence to show the appellant exposed the victim to the AIDS virus both through sexual conduct and by biting her, thus proving he committed the crime.
He lastly argues that his conviction cannot stand, because the State failed to prove he bit the victim with the intent of exposing her to the AIDS virus. In support, he cites cases from other jurisdictions, which required the State to prove that the defendants intended to infect their victims. However, in each of those cases the defendant was either charged with attempted murder, i.e. intending to kill the victim, or with some sort of assault which also required the intent to harm the victim. See State v. Smith, 262 N.J.Super. 487, 621 A.2d 493 (A.D.1993), where the defendant bit a prison guard and was convicted of attempted murder; Weeks v. State, 834 S.W.2d 559 (Tex.App. 1992), where the defendant spit on a guard and was convicted of attempted murder; Brock *272 v. State, 555 So.2d 285 (Ala.Crim.App. 1989), where the defendant bit a prison guard and was convicted of assault, which required the intent to cause serious bodily injury; State v. Haines, 545 N.E.2d 834 (Ind.App. 2 Dist.1989), where the defendant was convicted of attempted murder by biting and spitting at the victim; and U.S. v. Moore, 669 F.Supp. 289 (D.Minn. 1987), where the defendant bit two correctional officers and was convicted of assault with a dangerous weapon. Here, by contrast, the statute under which the appellant was charged and convicted does not require that the State prove the victim was harmed or that the appellant intended to harm the victim. Instead, the statute merely requires that the perpetrator intentionally expose his victim to the AIDS virus, whether or not the victim is ultimately infected with the virus.
La. R.S. 14:43.5 does not require the State to prove that a defendant acted with the specific intent to expose the victim to the AIDS virus; rather, it requires the State to prove that the defendant intentionally committed an act proscribed by the statute which exposed the victim to the AIDS virus. By providing evidence that the appellant raped and bit the victim and that he had been convicted previously of intentionally exposing another victim to the AIDS virus, the State provided sufficient evidence for the jury to find beyond a reasonable doubt that he was guilty of intentionally exposing this victim to the AIDS virus. This assignment of error is without merit.
Accordingly, the appellant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Due to the nature of the case, the victim's initials will be used.
[2] The contents of this tape were not transcribed.
[3] The contents of this call were also not transcribed.
[4] The contents of this call were also not transcribed.
[5] 1999 La. Acts 94, effective August 15, 1999, embodied La. R.S. 15:301.1 which provides:

A. When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit of probation, parole, or suspension of sentence, each sentence which is imposed under the provisions of that statute shall be deemed to contain the provisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.
B. If a sentence is inconsistent with statutory provisions, upon the court's own motion or motion of the district attorney, the sentencing court shall amend the sentence to conform to the applicable statutory provisions. The district attorney shall have standing to seek appellate or supervisory relief for the purpose of amending the sentence as provided in this Section.
C. The provisions of this Section shall apply to each provision of law which requires all or a portion of a criminal sentence to be served without benefit of probation, parole, or suspension of sentence, or of any one of them, any combination thereof, or any substantially similar provision or combination of substantially similar provisions.
D. Any amendment to any criminal sentence as authorized by the provisions of this Section shall be completed within one hundred eighty days of the initial sentencing.
[6] The appellant also cites State v. Schmidt, 99-1412 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, writ den. 2000-2950 (La.9/28/01), 798 So.2d 105, cert. den. Schmidt v. Louisiana, 535 U.S. 905, 122 S.Ct. 1205, 152 L.Ed.2d 143 (2002) for this proposition. However, the defendant in that case was convicted of attempted second-degree murder by injecting his girlfriend with the HIV virus.
[7] He also argues unconvincingly the State failed to prove there was saliva in his mouth at the time he bit her.