262 N.J. Super. 487 (1993)
621 A.2d 493
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GREGORY DEAN SMITH, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 18, 1992.
Decided February 17, 1993.
*491 Before Judges KING, LANDAU and THOMAS.
Ronald L. Kuby argued the cause for appellant (William M. Kunstler, Center for Constitutional Rights, and Justin Loughry of the firm Tomar, Simonoff, Adourian & O'Brien, on the brief).
Roseann A. Finn, Assistant Prosecutor, argued the cause for respondent (Edward F. Borden, Jr., Camden County Prosecutor, attorney; Ms. Finn, on the brief).
Robert J. Del Tufo, Attorney General of New Jersey, filed a brief amicus curiae (Jeffrey L. Weinstein, Deputy Attorney General, of counsel and on the brief).
American Civil Liberties Union of New Jersey and American Civil Liberties Union Foundation filed a brief amicus curiae (Debora A. Ellis and Ruth E. Harlow, on the brief; William B. Rubenstein, American Civil Liberties Union Foundation, of counsel; Evan Wolfson, Lambda Legal Defense & Education Fund, of counsel).
Zulima V. Farber, Public Defender of New Jersey, filed a brief amicus curiae (Audrey Bomse, Assistant Deputy Public Defender, of counsel; Alice K. Dueker, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
*492 Defendant was a county jail inmate at the time of this criminal episode on June 11, 1989. He had, and knew he had, the human immunodeficiency virus (HIV). On several occasions before June 11 he had threatened to kill corrections officers by biting or spitting at them. On that day he bit an officer's hand causing puncture wounds of the skin during a struggle which he had precipitated. The jury found him guilty of attempted murder, aggravated assault and terroristic threats. The judge imposed an aggregate 25-year term with a 12 1/2-year period of parole ineligibility.
On this appeal each of defendant's claims of error arises from his premises that (1) without dispute a bite cannot transmit HIV, and (2) defendant knew this when he bit the officers. From these premises defendant urges that he was wrongfully convicted of attempted murder because he knew that his bite could not kill the officer. He insists that he was convicted of such a serious charge because of society's discrimination against persons infected with this deadly virus. He claims that at worst he was guilty only of assaultive conduct and should have been sentenced, as a third-degree offender, to a relatively short custodial term.
From our review of this record, we conclude that neither of defendant's two premises has been established. First, if HIV cannot possibly be spread by a bite, the evidence at trial did not establish that proposition. Indeed, we doubt that the proposition is presently provable scientifically, given the current state of medical knowledge. The apparent medical consensus is that there has never been a controlled study of a sufficiently large number of cases to establish to any scientific certainty if transmission of HIV is possible by a bite, and if so, the percentage of likely infection. The proposition was surely disputed at this trial. Second, whether defendant actually believed that his bite could result in death was a question of his credibility, a question the jury obviously resolved against him.
*493 We cannot and need not decide if a bite can transmit HIV. We have applied the elements of the attempted murder statute as we would in a case involving a more traditional criminal methodology. We conclude that the attempted murder verdict was supported by proof, which the jury reasonably could accept, that the defendant subjectively believed that his conduct could succeed in causing the officer's death, regardless of whether his belief was objectively valid. For this reason, we affirm the conviction.

I
On April 14, 1989 defendant was committed to the Camden County jail for trial on robbery charges. In September 1988 defendant had been tested and found positive for HIV. His jailers incarcerated defendant in a special section at the Camden County jail known as the "blood alert" area. This meant the guards would take extra care if blood was spilled during an altercation. Defendant would often talk to the guards about his HIV infection, telling them that he would do anything to get out of the county jail and go to a State prison, where he felt he would receive better medical treatment. He contacted a reporter from a local newspaper, which had printed an article regarding the treatment of HIV and AIDS prisoners in the Camden County jail.
On May 5 defendant began kicking his cell door and yelling to get out. When he refused to stop, corrections officers entered his cell, handcuffed him, and shackled him to his bed. While the officers were subduing him, he threatened to bite and spit on them if they came any closer. During the struggle defendant "started showing his teeth" at the officers.
On May 17 defendant put his foot in the door of his cell as an officer was trying to close it. This required other officers to come and force defendant back into the cell where they restrained him. During that struggle defendant jumped up on his bed and told the officers that "he was going to take one of *494 us the fuck out." He told one officer "that he would have me taken care of by getting his brothers to blow up my car, he was going to have me killed." He also threatened to bite one of the officers.
Later in the evening of May 17 another officer was putting defendant back into restraints after a trip to the bathroom when defendant "spit at me several times telling me that he'd take me out." As the officer tried to subdue him, defendant was "trying to get out of the restraints, very aggressive, thrashing around, spitting constantly," and threatening to spit in the officer's mouth, which he tried to do.
The incident giving rise to this prosecution occurred on June 11, 1989. Correction Officers Snow and Waddington were ordered to escort defendant to the nearby Cooper Hospital Emergency Room. Defendant claimed that he had fallen in his cell and injured his head and back. As a precaution against further injury, the ambulance squad placed defendant on a backboard with a neck brace, and, according to standard procedure, the corrections officers handcuffed and shackled him.
Before the five-minute trip to the hospital, Snow and Waddington's supervisor told them that defendant had HIV. The officers put on rubber gloves as a precaution. Officer Waddington was armed with a .38 revolver. At the Cooper Hospital emergency room, defendant told the nurse that "he felt woozy and fell down and hit his back and his head in the jail." Dr. Nathan then examined him and decided that no X-rays were necessary and that "there was nothing essentially wrong with Mr. Smith." According to the nurse, defendant's reaction was to demand to see another doctor and to call Dr. Nathan a "white bitch." When another physician, Dr. Weems, came and confirmed Dr. Nathan's opinion, defendant, according to the nurse, "yelled out to Dr. Weems to go fuck himself and he was screaming out all these things that because he was black we were  we weren't taking care of him, we were all white staff *495 and because he had AIDS we weren't giving him proper care and he was very disruptive to the emergency room."
Defendant then demanded his medical records but Officers Waddington and Snow were unable to get them. The hospital's policy was not to release records to patients. At that point defendant "was out of control," screaming, grabbing a monitor and threatening to break it. Waddington and Snow attempted to subdue defendant. As they approached him, he grabbed a "metal cylinder" and tried to throw it at Snow. The officers rushed defendant and grabbed him. Defendant "went limp" and began screaming "they're beating me, they're beating me." Because he refused to leave on his own power, Snow and Waddington grabbed him under the shoulders and dragged him out of the emergency room into a nearby waiting room until a patrol car came to take them back to the county jail. Throughout this period, defendant had leg irons and handcuffs on; departing from normal procedure, he was handcuffed in the front, a concession to his claimed back injury.
As the officers dragged defendant from the emergency room, he began "snapping his teeth" at Snow and threatening him:
Yes, he threatened me personally, he said that he was going to bite me, he was going to give me AIDS, I know what he has, I'm going  you're going to give me  I'm going to give you AIDS, I'm going to bite you, I'm threatening you, he started threatening my family, I'm going to find you, I'm going to get your family, you know I'm out of here in April and he's going on and on....
Through this tirade, Snow was holding defendant down in order to avoid his mouth. Snow described his own reaction as follows:
All I was thinking of, and I was really scared at this point, I mean I was  I just kept his face as far away from me as I could because he had been snapping at me and he had said like, you know, he was going to try to kill me by biting me and I was really scared. I just wanted to keep his mouth away from me and I just felt like I just want to get out of there. I don't want to be here, but this is my job and I'm doing it the best I can. And all this was going on about the, you know, while we're waiting for the squad car to come over. I guess it was 15 or 20 minutes we had to wait and put up with this verbal abuse. And he's trying to bite me and I was just holding on for basically dear life.
Officer Waddington described the scene this way:
From the time we started escorting him down the hall when he was in the fetal position he was threatening that he was going to bite us, that he had *496 AIDS and we're going to get AIDS and we're going to die too. The first chance he gets he said I'm going to kill you mother fuckers. We just kind of put it out of our way and just kept on doing what we had to do.
Q. As you were walking down the hall and he was making those threats did he make any movements or any gestures towards either one of you?
A. He was thrashing his head back and forth towards Officer Snow and myself and we kept him away from us and tried dragging him out. That's what made it difficult.
Waddington also testified that:
Gregory just kept on saying if I get my  if I get my mouth on you I'm going to bite you, I'm going to give you AIDS, Waddington, he says if I see you out on the street I'm going to come get you, I'm going to kill you, I'm going to go after your family, just basically threatening us that he's going to give us this virus or HIV positive blood that he has he's going to transfer to us.
After Officer Polk arrived with a patrol car, Waddington and Snow dragged defendant out of the hospital. He tried to break loose and hit Snow with the handcuffs. In the ensuing tussle, all three fell into the street. By that point in the struggle, the officers' rubber gloves had come off. Snow said that he "saw as Gregory pulled his teeth off Al's hands, Officer Waddington, there were several puncture wounds and I was very scared at that point because he had already threatened me." Snow saw "noticeable blood and puncture wounds right as he [defendant] came off" Waddington's hand.
The officer finally got defendant into the backseat of the cruiser. Snow sat next to defendant. Waddington rode in the front passenger seat, and Polk drove. When Snow got in the backseat, defendant began kicking him and attacking him with the handcuffs. At that point, the officers put the handcuffs behind defendant's back.
During the ride back to the jail, defendant continued his harangue; he spit in Waddington's face saying, "I hope you die, you pig, Waddington." According to Waddington, defendant "said something to Snow about if he gets a chance he's going to bite him, give him AIDS and he says you, Waddington, he goes and he spit on the back of my neck, he said now die, you pig, die from what I have." Defendant then leaned over and "tried to bite Snow on the side of the face."
*497 Back at the jail, Waddington noticed blood coming from the bite wounds on his hand. He immediately went to the nurse on duty who cleaned the wounds and gave him a tetanus shot. The nurse advised Waddington "to go to the hospital." The State introduced two photographs, taken two or three days after the incident, showing the bite wounds.
On June 14, 1989 Waddington was treated by Dr. Zimmerman, whose practice included treating job-related injuries of Camden County personnel. Waddington told the doctor that he had been bitten by a prisoner who was HIV positive. Dr. Zimmerman prescribed an oral antibiotic as a preventative measure against infection, and "administered hepatitis B immunoglobulin" as a precaution against hepatitis. In explaining his treatment, Dr. Zimmerman testified that human bites, even without involvement of HIV, can cause "very nasty;" and even fatal, infections. Since the incident, Waddington has undergone continued testing for HIV. As of the time of trial in April 1990, the tests had been negative.
The State presented testimony about two later incidents tending to demonstrate defendant's motives. On June 12, 1989 defendant refused to take a shower when told by Corrections Officer Cowgill. Defendant responded that he would bang on the door of his cell all day unless he were allowed to shower at a later time. To make him stop banging, Cowgill and other officers cuffed and shackled defendant. While the officers were restraining defendant, defendant said, according to Cowgill, "You know what I have and I'll give it to you if you ... attempt to come in here and cuff and shackle me." Cowgill thought that defendant was referring to AIDS.
The other incident occurred on October 17, 1989 as defendant was being processed for transfer to Trenton State Prison. McIntyre was the corrections officer on duty. Defendant began verbally abusing and threatening him. He told him "that he had AIDS, that he would bite me, that I will die with him." As McIntyre let defendant out of his cell, he swung at McIntyre *498 and "made multiple attempts at biting" him as he tried to subdue defendant.
On the point of HIV transmission by a human bite, the State offered Dr. Porwancher, as an expert in infectious disease. He was Board-certified in internal medicine and infectious diseases and the Chief of Infectious Diseases at St. Francis Hospital, Trenton and had treated at least 1,000 AIDS patients. He testified that AIDS is usually fatal within two years and is caused by HIV. Upon acquiring HIV, a person develops AIDS within a period of years, the median period is about ten years. HIV can not be transmitted by casual contact, such as a sneeze, a handshake, a kiss, or food prepared by someone with AIDS. HIV is present in all body fluids such as blood, semen, saliva and tears.
Dr. Porwancher identified three sources of information concerning the role of saliva in spreading HIV. First, the doctor cited a case report to the editor of Lancet, a well-respected medical journal, describing an incident in which a nurse was bitten on the leg by an AIDS patient and later tested positive for HIV. Second, Dr. Porwancher cited a second case report to the editor of Lancet, reporting that a child had contracted HIV after he was bitten by his brother, who had contracted AIDS from a blood transfusion. The third source of Dr. Porwancher's information was a conversation he had with Dr. Osmenoff from the Soviet Union, who had published data in a prominent Soviet medical journal reporting an outbreak of AIDS in mothers from bites by year-old infants while breast feeding. The infants had been infected with HIV by dirty syringes.
Dr. Porwancher conceded that none of his sources of information qualified as a controlled study. They were "anecdotal." Nonetheless, the doctor said that these incidents indicated to him that "it is possible to transmit [HIV] through bite wounds." He said, "within a reasonable degree of medical probability," that "it is on rare occasion possible to transmit the virus via a bite injury." After reviewing the medical records indicating *499 that defendant was infected with HIV, the doctor said that defendant was capable of transmitting HIV through his saliva. After looking at the photographs of Waddington's bite wounds, the doctor reaffirmed that HIV transmission was "possible" to Waddington via the bites.
Defendant offered his own infectious disease specialist, Dr. Condoluci who criticized the Lancet reports relied on by Dr. Porwancher, explaining in detail how neither warranted an inference that HIV was transmitted by a bite. According to Dr. Condoluci, there had been "two very well documented studies that concern bite wounds and the potential for transmission [of HIV]." In the two studies reported in recent medical journals (Journal of Aids and the Journal of the American Medical Association), no bite victim tested positive for HIV.
Based on a reasonable degree of medical certainty, Dr. Condoluci thought that there was "a very low probability of being infected following a bite wound of an adult as an isolated incident." He characterized the chances of such transmission as "extremely remote" and "very slim." Nonetheless, Dr. Condoluci conceded that if he treated a patient who had been bitten by an HIV carrier, he would test the patient for HIV. The doctor also acknowledged that the United States Department of Health and Human Services, in its published guidelines concerning the transmission of HIV, had indicated "that the role of the transmission of saliva vis-a-vis a bite is still unclear."
Defendant testified. He said that he was discontented at the Camden County Jail because the jail could not afford to provide HIV inmates with AZT, which he had been taking before he was incarcerated. Without AZT, his weight decreased from 145 to 110 pounds between April and June 1989. Defendant and some other inmates called the local newspapers to complain of the lack of proper medical attention. In addition, he wrote to the jail warden saying that "if they didn't move me out of here I was going to start up my shit. And what I meant by starting *500 up my shit was calling reporters again because I wanted to be transferred. I was weighing 110 pounds."
Defendant's account of the June 11 incident differed from the State's witnesses. Defendant said that on June 10 he had blacked out, striking his back and head. He attributed this fall to his weakness from the lack of AZT. A nurse examined defendant and decided that he should be taken to the hospital emergency room. Waddington and Snow handcuffed defendant, shackled him to a board, and escorted him to the hospital. A doctor examined defendant and refused his request for an X-ray. When defendant refused to leave without an X-ray, he said that Waddington pulled him off the examining table, threw him on the floor, and handcuffed him. Waddington then dragged him into another room and began beating and punching him, telling him "how much he hated niggers," according to defendant.
The officers then dragged defendant outside and pushed him into a patrol car. He denied spitting or biting Waddington, attributing Waddington's wounds to cuts sustained from defendant's handcuffs. Defendant also denied threatening any of the officers with his HIV condition. According to defendant, each of the witnesses who testified to such a threat or attack lied. Defendant filed simple assault charges against Waddington as a result of the June 11 incident.
According to the information known to defendant, AIDS could be contracted in only three ways  "sexually, blood transfusion or using needles." He believed AIDS transmission by a bite "impossible." As sources of his knowledge, defendant cited his own readings, conversations with doctors, and a discussion with Eugene Niblack, a mental health worker who had counselled him in the jail. At trial, Niblack confirmed that he had told defendant the following:
I specifically indicated, as with all inmates whom I counseled in this area, that it was a very difficult virus to transmit. And I specifically discussed with him the fact that it could not be gotten from shaking hands, it could not be gotten *501 through spitting, it was extremely difficult, if not impossible, to get through biting.
Defendant's sister-in-law, Donna Smith, a corrections officer on duty during the June 11 incident, also testified on his behalf. Donna Smith saw Waddington drag defendant back into his cell. Waddington then told Donna Smith that defendant had bit him on the hand. She saw two scratches on his hand; she said that they were not punctures and there was no blood. Donna Smith was also present when defendant was being examined by the nurse on return from the hospital; she saw black and blue marks on defendant's back, which had not been there when he left the jail to go to the hospital.
In August 1989 defendant was indicted for:
Count One: attempted murder of Officer Waddington, contrary to N.J.S.A. 2C:5-1 and 2C:11-3(a);
Count Two: attempted murder of Officer Snow;
Count Three: third-degree aggravated assault on Officer Snow, who was acting in the performance of his official duties, contrary to N.J.S.A. 2C:12-1(b)(5);
Count Four: third-degree aggravated assault on Officer Waddington, who was in the performance of his official duties;
Count Five: third-degree terroristic threats against Officers Snow and Waddington, contrary to N.J.S.A. 2C:12-3(b);
Count Six: second-degree aggravated assault on Officer Waddington, contrary to N.J.S.A. 2C:12-1(b)(1).
Count Two was dismissed before trial. In November 1989 defendant again was indicted, in a single count indictment, charging terroristic threats against Officer McIntyre, contrary to N.J.S.A. 2C:12-3(a) & (b). The indictments were consolidated for trial.
On April 11, 1990 the jury returned a verdict of not guilty on the single count in the second indictment charging threats against McIntyre. The jury found defendant guilty on each of the five remaining counts in the first indictment.
Judge Mariano sentenced defendant as follows:
Count One: 20 years in prison with a ten-year period of parole ineligibility;
Count Three: five years in prison with a two and one-half-year period of parole ineligibility, consecutive to the term imposed on Count One;

*502 Count Four: merged with Count One;
Count Five: five years in prison, concurrent with Count One;
Count Six: merged with Count One.
These are the issues raised by defendant on this appeal, in the order he presents them:
1. DID THE SENTENCING JUDGE ERR IN REFUSING TO APPLY THE MITIGATION-OF-SENTENCE PROVISION OF N.J.S.A. 2C:5-4(b)(1).
2. WERE THE GUILTY VERDICTS ON ATTEMPTED MURDER AND AGGRAVATED ASSAULT AGAINST THE WEIGHT OF THE EVIDENCE.
3. DID THE TRIAL COURT COMMIT PLAIN ERROR BY CHARGING THE JURY THAT DEFENDANT COULD BE FOUND GUILTY OF ATTEMPTED MURDER UPON PROOF THAT DEFENDANT INTENDED TO KILL WADDINGTON BY BITING HIM, REGARDLESS OF WHETHER IT WAS MEDICALLY IMPOSSIBLE FOR THE BITE TO TRANSMIT HIV.
4. DID THE TRIAL COURT COMMIT PLAIN ERROR BY FAILING TO CHARGE THE JURY TO ASSESS DEFENDANT'S CRIMINAL PURPOSE BY CONSIDERING THE UNSUITABILITY OF A BITE AS A MEANS OF SPREADING HIV.
5. DID THE TRIAL COURT ERRONEOUSLY CHARGE THE JURY IN SUCH A WAY AS TO ALLOW IT TO APPLY A SUBJECTIVE TEST TO THE TERRORISTIC-THREATS OFFENSE.
6. WAS THE VERDICT AS TO TERRORISTIC THREATS AGAINST THE WEIGHT OF THE EVIDENCE.
7. DID THE TRIAL COURT ERR IN ADMITTING THE OPINION TESTIMONY OF THE STATE'S MEDICAL EXPERT REGARDING THE POSSIBILITY OF HIV TRANSMISSION VIA A BITE.
We address these issues in a somewhat different order than presented by defendant.

II
Defendant contends that Judge Mariano erroneously charged the jury that it could find him guilty of attempted murder upon proof that he intended to kill Waddington by biting him, regardless of whether it was medically possible that the bite could have transmitted HIV. Instead of focusing on his subjective belief about the effect of the bite, defendant contends the judge should have charged an objective test. Defendant claims that he can be guilty only if a "reasonable person" would have believed that the bite could be fatal.
*503 As defendant concedes, he neither requested such a charge nor objected to the charge as given. This point is not cognizable on appeal unless it qualifies as "plain error," R. 1:7-2, R. 2:10-2, a "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538, 257 A.2d 699 (1969), cert. denied, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970). Defendant insists that this error so qualifies, because the mistaken charge made "it easier for the jury to convict" him. He reasons that the charge, as given, allowed the jury to convict upon a finding only that defendant subjectively intended to kill, and not, as it should have been required to find, that the attempt was objectively likely to succeed. We consider this claim under the "plain error" doctrine.
The statute governing criminal attempts is N.J.S.A. 2C:5-1. The pertinent part of that statute is the definitional subsection:
a. Definition of attempt. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:
(1) Purposely engages in conduct which would constitute the crime if the attendant circumstances were as a reasonable person would believe them to be;
(2) When causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing such result without further conduct on his part; or
(3) Purposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.
On its face this section creates three separate categories of attempt, two of which incorporate a reasonable-person standard  subsections (1) and (3)  and one of which looks only to defendant's own purpose  subsection (2). John M. Cannel, New Jersey Criminal Code Annotated, comments 4-6 on N.J.S.A. 2C:5-1, at 190-91 (1993). Judge Mariano charged on subsection (2) only, saying:

*504 Our law provides that a person is guilty of an attempt to commit a crime if the person, acting with the same culpability or state of mind required for the commission of the substantive offense, the crime of murder in this case, does anything with the purpose of causing death, without any further conduct on his part.
The judge then explained that defendant must have "done all that he believes necessary to cause the particular result," here, the death of Waddington. Our Criminal Code "requires that to be guilty of attempted murder, a defendant must have purposely intended to cause the particular result that is the necessary element of the underlying offense  death." State v. Rhett, 127 N.J. 3, 7, 601 A.2d 689 (1992).
The judge then charged that it was irrelevant whether the jury found that a bite could succeed in transmitting HIV:
I must instruct you that impossibility is not a defense to the charge of attempted murder. That is because our law, our criminal statutes punish conduct based on state of mind. It punishes purposeful actions regardless of whether the result can be accomplished. And even if the result, which would be death in this case, was a scientific or factual impossibility. In this case if you should be convinced beyond a reasonable doubt by the State's evidence that Mr. Smith's purpose was to kill Sheriff's Officer Waddington by biting him it does not matter that the chances of spreading the virus were either remote or impossible. If the State has proven purposeful conduct beyond a reasonable doubt then the State has proven the essential elements of the crime attempted murder.
Defendant contends that the judge deprived him of the impossibility defense created by the "reasonable person" language of subsection (1). Defendant overlooks the separate and different standard announced in subsection (2), which was intended to eliminate an impossibility defense. "Under this Section [subsection (2)], where the actor has done all that he believes necessary to cause the particular result which is an element of the crime, he has committed an attempt." The New Jersey Penal Code, Vol. II: Commentary, Final Report of the New Jersey Criminal Law Revision Commission 148-49 (1971) (hereinafter New Jersey Penal Code). This subsection was taken verbatim from the Model Penal Code, section 5.01(1)(b). See Cannel, supra, Criminal Code Annotated, comment 1 on N.J.S.A. 2C:5-1, at 187. The drafters of the Model Penal Code *505 explained that Section 5.01(1)(b) rejected the defense of impossibility, "liability being focused upon the circumstances as the actor believes them to be rather than as they actually exist." Model Penal Code § 5.05, commentary at 490-91 (1985). See Paul H. Robinson, Fundamentals of Criminal Law 491 (1988); 1 Paul H. Robinson, Criminal Law Defenses § 85, at 427 (1984).
New Jersey's Legislature departed from the Model Penal Code as to the first and third categories, imposing the reasonable-person standard in place of the Model Penal Code's subjective standard, i.e., circumstances were "as he believes them to be." Cannel, supra, Criminal Code Annotated, comment 4 on N.J.S.A. 2C:4-5, at 190. In adopting verbatim the second category, the Legislature demonstrated its intent to embrace a subjective standard as to that category. The omission of the "reasonable person" language in subsection (a)(2) shows a strong legislative purpose to reject the impossibility defense in "result"-type offenses where the defendant has committed what he believes to be the "last proximate act" necessary to complete the offense.
Under N.J.S.A. 2C:5-1(a)(2), defendant may properly be found guilty without a concomitant finding that the bite would more probably or likely than not spread HIV. We think it sufficient that defendant himself believed he could cause death by biting his victim and intended to do so. As we conclude in III, there was ample evidence to support the jury's finding of defendant's criminal purpose to kill the correction officer.
Defendant disagrees with the State's insistence that N.J.S.A. 2C:5-1(a) sets forth three independent or separate bases for criminal responsibility. Instead, claims defendant, subsections (1) and (2), "far from creating two different kinds of liability, create one type of attempt liability with two different aspects, both of which must be satisfied. This is why the two subsections are written in the conjunctive, separated by a semicolon, rather than the disjunctive, [separated by "or"] as are subsections *506 (2) and (3)." Defendant also suggests how a "better drafter" could have more clearly expressed the meaning he infers.
As much as defendant would have preferred a statute joining both subsections (1) and (2) as correlative and requisite elements of criminal attempt, the Legislature enacted a different version, one which we cannot reasonably read as defendant wants. Purely as a matter of grammar, the three subsections are disjunctive. When items in a list are joined by a comma or semicolon, with an "or" preceding the last item, the items are disjunctive. See State v. Andrews, 707 P.2d 900, 905-06, 908 (Alaska Ct. App. 1985), aff'd o.b., 723 P.2d 85 (Alaska 1986); 1A Norman J. Singer, Sutherland Statutory Construction § 21.14, at 127-28 (4th ed. 1985). As a principle of statutory construction, this rule is subject to exception if its application would subvert the clear legislative intent. State v. Andrews, supra, 707 P.2d at 908. But here there would be no such violation of legislative intent. The legislative history of this section compels our conclusion that the drafters intended three separate kinds of attempt, any one of which triggers criminal liability. The Final Report of the Criminal Law Revision Commission analyzes each subsection of N.J.S.A. 2C:5-1(a) as a separate basis for criminal liability. New Jersey Penal Code, supra, at 114-16. The leading commentator has so recognized: "Subsection (a) recognizes three categories of attempt." Cannel, supra, Criminal Code Annotated, comment 2 on N.J.S.A. 2C:5-1, at 188. We reject defendant's invitation to "improve" on the Legislature's drafting.
Our research and counsels' diligence disclose several similar cases from other states. In Scroggins v. State, 198 Ga. App. 29, 401 S.E.2d 13 (1990) (cert. denied January 7, 1991), defendant, who had HIV, bit a policeman trying to subdue him during a domestic disturbance. The jury found defendant guilty of aggravated assault with intent to murder. Defendant contended that the verdict was not supported by the evidence, *507 absent proof that "the HIV virus can be transmitted by human saliva." Id. at 16. The Georgia statute, Ga. Code Ann. § 16-4-4, provides that factual or legal impossibility is not a defense to attempted murder, "if such crime could have been committed had the attendant circumstances been as the accused believed them to be." Id. at 18. The Georgia Court of Appeals found there was ample evidence supporting a finding that defendant "believed he could transmit the virus in the method used," making it immaterial "that it might have been impossible to do so." Ibid. As evidence of his state of mind, the court cited defendant's laughter when his victim asked him after the attack if he "had AIDS," together with "the unsettled state of the body of knowledge as to the transmission of the AIDS virus" in 1989. Id. at 18-19. That the possibility of transmission might have been slight did not preclude defendant's conviction:
Appellant makes much of the expert's testimony that there is only a "theoretical possibility" of transmittal of the virus through saliva, but a "theoretical possibility" is clearly a "possibility," or else the phrase has no meaning. So long as medical science concedes this "theoretical possibility," the jury was well within the evidence to consider the human bite of a person infected with the AIDS virus to be "deadly." Where a medical expert under thorough examination, testifies to his knowledge of the subject and still cannot state one way or the other whether a particular instrumentality is "deadly," the jury in considering all the circumstances, including the risk to the victim and to society, is at least as competent as the witness to determine whether it was an instrument likely to produce death. See Moran v. State, 120 Ga. 846, 48 S.E. 324. [Id. at 20.[1]]
*508 In State v. Haines, 545 N.E.2d 834, 835 (Ind. Ct. App. 1989), a jury convicted defendant on three counts of attempted murder, based on evidence that he bit and spread blood from his own wounds onto a police officer and paramedics, yelling that he had AIDS and would give it to them. The evidence established that (1) defendant was, and knew he was, infected with the AIDS virus; (2) he believed his condition to be fatal; and (3) he intended to infect others "by spitting, biting, scratching and throwing blood." Id. at 838. The trial judge vacated the conviction on the ground that the state had failed to prove that the AIDS virus could be spread by the means used by defendant.
The Indiana Court of Appeals reversed, citing that state's statute expressly rejecting impossibility as a defense to an attempted crime. Id. at 839. The court reasoned that "the State was not required to prove that Haines' conduct could *509 actually have killed. The State needed only to show that Haines did all that he believed necessary to bring about an intended result, regardless of what was actually possible." Ibid. The defendant had repeatedly announced that he had AIDS and desired to infect and kill others. At the hospital, he was told by doctors that biting and spitting, and throwing blood was endangering others. In any event, observed the Indiana court, the medical evidence showed that transmission by bites or contact with blood was at least possible, and to a degree that exceeded a merely theoretical or speculative chance. Id. at 841.
In Weeks v. State, 834 S.W.2d 559 (Tex. Ct. App. 1992) (review refused October 14, 1992), a jury convicted defendant of attempted murder, based on proof that defendant, who was HIV positive, had spit on a prison guard with the intent to infect him. Under Texas' attempted murder statute, the accused had to intend to kill his victim, and, in contrast to N.J.S.A. 2C:5-1(a)(2), he had to commit an act that "could have caused" that victim's death. Id. at 561. The intent element was undisputed; there was conflicting medical evidence as to whether HIV was transmittable by saliva. Id. at 562-64. Since the jury resolved the conflict against defendant, the Texas appellate court deferred to the jury's finding. Id. at 565. That court rejected the defendant's invitation to take judicial notice that it is impossible to spread HIV through spitting: "Many of the AIDS experts express the opinion that it is impossible to transmit HIV through saliva. However, this has not been conclusively established and is not free from reasonable dispute." Id. at 562 n. 2.
In the case before us, there was ample evidence from which the jury could have concluded that defendant did all that he believed was necessary to infect Waddington. We conclude that the judge properly submitted the case to the jury under N.J.S.A. 2C:5-1(a)(2). Under this subsection the objective probability or likelihood of infection was irrelevant. The Legislature's purpose under this subsection of the attempt statute was to criminalize the mental intent to commit a crime when defendant had engaged in conduct sufficient, as far as he knew, to *510 result in that crime. The circumstances of this case fall squarely within that prohibition. We find no error, "plain" or otherwise, in the judge's careful refusal to impose a "reasonable person" standard on N.J.S.A. 2C:5-1(a)(2) where the Legislature clearly retained the Model Penal Code's subjective approach for this type of offense.
In his Point Four, closely related to the preceding argument, defendant contends "plain error" in the charge in barring the jury from considering the unlikelihood that the AIDS virus could be spread by a bite. Defendant reasons: "The court below should have instructed the jury that it should consider the unsuitability of the means chosen in its determination of whether Smith acted with the requisite purpose."
Defendant invokes the following excerpt from the commentary to the Model Penal Code as authority for his theory: "if the means selected were absurd, there is good ground for doubting that the actor really planned to commit a crime." Model Penal Code, supra, § 5.01, commentary at 315. Defendant equates his biting Waddington with a "voodoo incantation" which is medically incapable of causing death, regardless of whether a person believed to the contrary.
Again, defendant's theory founders on its premise. There was no proof at trial that biting could not possibly transmit HIV. Rather, the evidence was equivocal, with even defendant's expert conceding that there was at least a "remote" possibility of transmission. In any event, the objective likelihood of transmission is irrelevant to liability under N.J.S.A. 2C:5-1(a)(2). It is sufficient that defendant believed his attack would infect Waddington. Such a belief would not necessarily be "absurd" in the same way that a belief in the efficacy of a voodoo curse is unfounded.
Moreover, even if the voodoo analogy is apt, defendant could still be found guilty if the circumstances showed that defendant was "dangerous":

*511 Cases can be imagined in which it might well be accurate to say that the nature of the means selected, say black magic, substantially negates dangerousness of character. On the other hand, there are many cases as well where one who tries to commit a crime by what he later learns to be inadequate methods will recognize the futility of his course of action and seek more efficacious means. There are, in other words, many instances of dangerous character revealed by "impossible" attempts, and to develop a theory around highly exceptional situations ignores the propriety of convictions in these. [Model Penal Code, supra, § 5.01, commentary at 316 n. 88.]
In the present case defendant's violent assaults and venomous harangues before, during and after biting Waddington, all justified an inference that he bore the requisite criminal state of mind under N.J.S.A. 2C:5-1(a)(2). The judge did not err in failing to charge that the jury should consider the probable efficacy of a bite in spreading HIV.

III
Defendant contends that the verdicts on Counts One and Six (attempted murder and aggravated assault of Waddington) were against the weight of the evidence, given the "wholly uncontroverted" evidence that defendant knew that AIDS could not be transmitted through biting or spitting. While he concedes the State's evidence shows that he repeatedly threatened to kill various officers by biting them or spitting at them, he contends that, in view of his certain knowledge that neither kind of attack could spread AIDS, his only true motive was to take "advantage of the ignorance and fear of his jailors." He pleads that he should not be punished for exploiting that fear and ignorance.
Defendant admits that he failed to move for a new trial on this ground. Thus, this point is not cognizable on appeal: "the issue of whether a jury verdict was against the weight of the evidence shall not be cognizable on appeal unless a motion for a new trial on that ground was made in the trial court." R. 2:10-1. Hence we may refuse to consider it. State v. Ross, 249 N.J. Super. 246, 253, 592 A.2d 291 (App.Div. 1991). But we can proceed to the merits, if we choose, in the interest of justice. *512 See, e.g., State v. Pickett, 241 N.J. Super. 259, 266, 574 A.2d 1014 (App.Div. 1990); R. 2:10-2.
In considering whether a jury verdict was against the weight of the evidence, our task is to decide whether "it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. We must sift through the evidence "to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present." State v. Carter, 91 N.J. 86, 96, 449 A.2d 1280 (1982). But an appellate court may not overturn the verdict "merely because it might have found otherwise upon the same evidence." State v. Johnson, 203 N.J. Super. 127, 134, 495 A.2d 1367 (App.Div. 1985), certif. denied, 102 N.J. 312, 508 A.2d 195 (1985). Appellate intervention is warranted only to correct an "injustice resulting from a plain and obvious failure of the jury to perform its function." State v. Johnson, supra, 203 N.J. Super. at 134, 495 A.2d 1367. Where the jury's verdict was grounded on its assessment of witness credibility, a reviewing court may not intercede, absent clear evidence on the face of the record that the jury was mistaken or prejudiced. State v. Haines, 20 N.J. 438, 446-47, 120 A.2d 118 (1956).
Defendant bases this contention on the premise that the State's evidence did not refute his own contention: that he knew HIV could not be spread by a bite or by spitting at someone. Defendant's evidence on this point came from two sources. First, Eugene Niblack, a mental health worker, testified that he counselled defendant at the County Jail in May 1989. In talking about the ways HIV was transmitted, Niblack "specifically discussed with him the fact that it could not be gotten from shaking hands, it could not be gotten through spitting, it was extremely difficult, if not impossible, to get through biting." Second, defendant himself testified that before he entered the Camden County Jail, he knew that AIDS could be transmitted only "sexually, [by] blood transfusion or using needles." The source of this knowledge was his own *513 reading and conversations with physicians. He had also discussed the issue with Niblack in the jail.
In addition, a State's witness, Dr. Khan, testified that he detected defendant's HIV in September 1988, and that when he discussed the positive result with defendant, he told defendant of two ways the virus could be transmitted: "sharing of needles" and sexual intercourse. Dr. Khan did not say that he told defendant that these were the only two ways, contrary to defendant's representation in his brief.
The State offered defendant's constant threats and acts as evidence that he in fact did believe that biting or spitting could spread HIV. His denial of that intent on the witness stand did not compel the jury to accept his version. The jury was free to reject his testimony as incredible. Johnson v. Salem Corp., 97 N.J. 78, 92, 477 A.2d 1246 (1984); State v. Pickett, supra, 241 N.J. Super. at 266, 574 A.2d 1014. Testimony, even undisputed testimony, must be credited only when it is reliable. Johnson, supra, 97 N.J. at 93, 477 A.2d 1246.
In this case there were no such mandatory indicia of reliability. A reasonable jury could have found ample evidence that defendant was lying at several points in his testimony. For example, though defendant denied biting or otherwise assaulting Waddington, the State presented photographs showing Waddington's hand wounds, as well as the testimony of Officer Snow that he saw defendant's teeth pulling away from Waddington's hand, leaving blood, and testimony of the prison nurse and doctor who treated the wounds. In addition, the State produced a parade of witnesses, both corrections officers and hospital personnel, who attested to defendant's threats to kill and attempts to bite or spit at his custodians. Defendant's only response was that all of these witnesses lied. Obviously the jury chose to believe the State's witnesses, as it reasonably could have done, given defendant's failure to provide a plausible explanation for so many joining in a plot to falsely accuse him.
*514 Hence the jury also reasonably could have rejected defendant's claim that he "knew" biting or spitting could not spread HIV, especially in view of the conflict in the record between that claim and his conduct in jail over several months. Defendant repeatedly used his HIV infection to arm his verbal threats to kill. He threatened: to spit in an officer's mouth; to give an officer "what I have" if the officer tried to shackle him; to give Officer Snow HIV by biting him; to bite or spit at Snow and Waddington so that they would get HIV and die; and to kill another officer by biting him. Moreover, when defendant spit at Waddington's head "he said now die, you pig, die from what I have."
Defendant now rationalizes this conduct, for purposes of appellate argument, as reflecting not his own belief that his bites could kill, but rather his realization that the officers' fear and ignorance would cause them to believe that the bites could be fatal. Defendant now terms this an "empowering experience" for him, allowing him to turn this nation's alleged hysteria over AIDS into a weapon against his aggressors.
Inventive as this theory may be, it requires far greater speculation than the jury had to indulge in when it found that defendant possessed the requisite mental state for attempted murder. If defendant were indeed motivated by the desire to take advantage of the correction officers' ignorance, he could have so testified. Even if defendant's personal conviction about society's indifference towards AIDS is correct, and it perhaps is, this does not exempt him from the crimes of attempted murder and aggravated assault under the criminal code.
Nor did Niblack's testimony invalidate the jury's verdicts. His account, if believed, did not prove that defendant "knew" that a bite could not transmit HIV. Niblack did not completely discount the possibility of such transmission: he told defendant that "it was extremely difficult, if not impossible" to transmit HIV by a bite. If defendant was guided by Niblack's advice at *515 all, he still might have believed that there was some chance that his bite would succeed in infecting his victim. Moreover, the jury could reasonably have found that, by his repeated threats to spread HIV by biting or spitting at officers, defendant had not paid attention to Niblack, who was not a doctor, or had forgotten what Niblack had said. We reject the contention that the verdict was not supported by the evidence and the reasonable inferences from the evidence.

IV
Defendant next contends that the judge erroneously instructed the jury on a key element of the terroristic-threat charge. He contends that the judge failed to apply the requisite objective, "ordinary hearer" test. Instead, he says, the judge permitted the jury to consider the officers' subjective reactions to defendant's threats, whether or not an "ordinary hearer" would have had the same reaction. This error was harmful, defendant contends, because no reasonable, ordinary person would think that a bite could transmit HIV. As defendant concedes, he did not object to this charge at trial. Hence his claim is cognizable only as plain error. R. 1:7-2.
Count Five of the indictment charged defendant with a violation of N.J.S.A. 2C:12-3(b): "A person is guilty of a crime of the third degree if he threatens to kill another with purpose to put him in imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat and the likelihood that it will be carried out." We have construed this language as requiring proof that the threats were objectively capable of conveying a fear of death:
[W]e do not construe the statute as requiring proof that the victim actually feared death or was under the apprehension that he was about to be killed. Some people are braver than others and less likely to be subject to intimidation. The criminality of the perpetrator's conduct should not depend on the courage or timidity of the intended victim. In our view, the statute merely requires that the threat be made under circumstances under which it carries the serious promise of death. Stated somewhat differently, the words or conduct must be of such a nature as would reasonably convey the menace or fear of death to the *516 ordinary hearer. [State v. Nolan, 205 N.J. Super. 1, 4, 500 A.2d 1 (App.Div. 1985) (footnote omitted).]
In his charge to the jury the judge quoted N.J.S.A. 2C:12-3(b). Then he charged that the State had to prove three elements:
Namely, number one, that Mr. Smith made a threat to kill either Waddington or Snow or both. Two, that when making the threat it was Mr. Smith's purpose to put Waddington and/or Snow in imminent fear of death under circumstances which really reasonably caused either Waddington and/or Snow to believe that the threat was immediate. And, number three, the State must prove beyond a reasonable doubt that the threat was made under such circumstance which reasonably caused either one or both of the victims to believe the threat was likely to be carried out.
He added that "the gist of this offense is that the words or acts of the defendant, Mr. Smith, were of such a nature as to reasonably convey the menace or the fear of being killed to either one or both of the victims."
The judge did not use the phrase "ordinary hearer" or "ordinary person." He did use the latter term in instructing the jury regarding the terroristic-threat charge against Officer McIntyre under N.J.S.A. 2C:12-3(a), threat of a "crime of violence": "Remember the standard in this case is words or actions used to convey the menace or fear of a crime of violence to the ordinary person who hears or witnesses the actions of the defendant." As observed earlier, the jury acquitted defendant on this charge.
The prosecutor called this omission to the judge's attention, saying: "Judge, I think you neglected to state with respect to the threat to kill that it was what the ordinary hearer [would think]." The judge denied having left out that concept and defense counsel agreed. Thus, while we address the merits of defendant's argument, defendant's claim that the jury was misled loses force in face of the fact that defense counsel perceived no prejudice in the context of the trial. See State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973) (failure to object warrants inference that alleged error inconsequential). Moreover, by affirmatively representing to the judge that the charge *517 did not contain the error now complained of, his counsel induced or acquiesced in that error, precluding defendant from asserting it as a ground for reversal. State v. Richardson, 208 N.J. Super. 399, 407, 506 A.2d 43 (App.Div.), certif. denied, 105 N.J. 552, 523 A.2d 188 (1986).
Defendant's theory fails on the merits as well. True, the charge would have been more complete with the "ordinary-hearer" language suggested by Nolan and used by the judge in his charge concerning Officer McIntyre. But the statute itself uses "reasonably" to convey the objective element and does not add the ordinary-hearer concept. Nor does the model charge require any more. See New Jersey Model Jury Charges, Criminal (1989) (charge on N.J.S.A. 2C:12-3(b)). The judge's caution that defendant's words had to "reasonably convey" a fear of death was sufficient to inform the jury that it must apply an objective test.

V
Defendant next contends that the verdict on the charge of making terroristic threats was against the weight of the evidence, because it is medically impossible that the bite could transmit HIV. Hence, reasons defendant, "[n]o rational person can believe that the HIV virus can be spread by biting." Since such a belief would not be a reasonable one, defendant concludes, the State failed to satisfy the objective test demanded by N.J.S.A. 2C:12-3(b). As with defendant's other attacks on the sufficiency of evidence, this point technically is not cognizable on appeal because defendant failed to move for a new trial on this ground. R. 2:10-1.
Treating the point under the plain error standard, we conclude that it has no merit. Once again defendant's theory depends on his premise that a bite cannot spread HIV, a premise by no means established by the evidence. Moreover, defendant assumes that all rational persons know that a bite is ineffective in transmitting the virus. Throughout his brief, he *518 laments society's ignorance about AIDS. But that very ignorance, perhaps better characterized as uncertainty, if he is correct, would tend to support an inference that a reasonable person would take seriously a threat by a hostile, HIV-infected person, under the circumstances of this case, to kill by biting. As noted by the prosecutor, even if the likelihood of transmission is remote, the test under N.J.S.A. 2C:12-3(b) is the reasonableness of the victim's fear. Given the medical evidence that there seems at least some possibility of transmission, and that even the defense's expert would test a bite victim for HIV infection, the jury reasonably could have found that defendant's words and conduct threatened death.

VI
Defendant protests the judge's decision to admit the opinion of the State's expert, Dr. Porwancher. He said it was "possible" for HIV to be spread by a bite. Defendant reasons that his opinion was inadmissible because (1) he couched his opinion in terms of mere possibility, not reasonable medical certainty; (2) given the prosecution's theory and the judge's ruling that impossibility was not a defense, the doctor's opinion was irrelevant and inflammatory; and (3) the doctor failed to cite a sufficient foundation for his opinion.
Before Dr. Porwancher testified, defense counsel alluded to a report, not offered into evidence, in which the doctor had expressed his opinion that transmission by a bite was "possible." Counsel moved to bar Dr. Porwancher on the ground that an expert is required to state his opinion in terms of reasonable medical certainty or probability. The prosecutor responded that the doctor would frame his opinion in those terms. The judge denied defendant's motion on the ground that this was not a case where the doctor was opining as to causation of an injury or disease. Rather, the issue was defendant's state of mind in biting Waddington. As to that issue, the doctor's testimony would help the jury understand a *519 complex medical area by setting forth the doctor's understanding of the current state of knowledge. Whether the doctor's opinion was reliable was a question of weight for the jury.
During direct examination Dr. Porwancher cited two case studies, as described in a medical journal, in which bite victims contracted HIV. He also referred to a conversation he had with a Soviet doctor, Dr. Osmenoff, who knew of and reported about incidents in which HIV had been spread through bites during breast feeding of year-old infants. Dr. Porwancher saw these cases as demonstrating "that it is possible to transmit the virus through bite wounds." This colloquy ensued:
Q. Let me ask you this question, Doctor: Are you able to give an opinion within a reasonable degree of medical probability of whether or not a human bite can, in fact, transmit the HIV virus to another?
A. Yes.
Q. And what is that opinion?
A. My opinion is that it is on rare occasion possible to transmit the virus via a bite injury.
At the conclusion of direct examination, defense counsel moved to strike this opinion testimony on the grounds that it was irrelevant and couched in terms of possibility only. Judge Mariano denied the motion, ruling that the doctor did in fact base his opinion on reasonable medical probability that, on rare occasions, transmission via a bite can occur. The judge candidly conceded that he "probably would have difficulty with that opinion" if this were a civil case where causation in fact of a plaintiff's injury was at issue. Instead, the testimony was relevant on the issue of defendant's mental state, and was necessary, he thought, to clarify an area beyond the ken of the jury.
Expert testimony by a doctor usually must be couched in terms of reasonable medical certainty or probability. State v. Harvey, 121 N.J. 407, 431, 581 A.2d 483 (1990). But that rule applies in cases where the doctor's opinion relates to some ultimate issue of causation, as with a cause-of-death issue in a criminal case, ibid., or with a cause-in-fact in a negligence case. *520 Johnesee v. Stop & Shop Companies, Inc., 174 N.J. Super. 426, 431, 416 A.2d 956 (App.Div. 1980); see, generally, Richard J. Biunno, New Jersey Rules of Evidence, comment 5 on Evid.R. 56(2), at 569 (1992). As the judge perceived, in this case the jury did not have to decide whether the bite did in fact infect Waddington (without dispute, not as yet), or whether it was medically likely for such infection to result from a bite. Rather, the key issue was whether defendant himself believed that biting Waddington might infect him, regardless of whether that belief was a reasonable one. In such a case, Dr. Porwancher's testimony need not necessarily have been cast in terms of reasonable medical causative certainty.
Defendant focuses on Dr. Porwancher's use of the word "possible" in testifying as to the likelihood of transmission via a bite; he ignores the form of the preliminary question of the prosecutor, in which he asked the doctor whether he had an opinion "within a reasonable degree of medical probability." What the doctor said, in effect, was that his opinion, i.e., transmission by a bite is possible, was based on a reasonable degree of medical probability; he explained the sources of his opinion, case studies allegedly confirming actual incidents of transmission.
We also think that the judge reasonably saw the permitted testimony as having an educational purpose. Such testimony is allowed by the Rules of Evidence:
A witness qualified pursuant to Rule 19 as an expert by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. [Evid.R. 56(2).]
"If the expert's testimony on such a subject would help the jury understand the evidence presented and determine the facts, it may be used as evidence." State v. Odom, 116 N.J. 65, 71, 560 *521 A.2d 1198 (1989). Even though impossibility was not a defense, in order to evaluate whether defendant's conduct manifested the requisite criminal purpose, the jury had to have some understanding of the current state of knowledge concerning HIV transmission. That subject was beyond a layperson's comprehension. Expert testimony was justifiable.
As the State points out, defendant himself raised the impossibility defense in his counsel's opening statement, arguing that the prosecution was grounded in AIDS "hysteria" and that HIV "can't be transmitted" by a bite. The State was entitled to anticipate that defense with expert testimony. Defendant pursued that defense at trial. He himself testified that he "knew" that HIV could not be contracted through a bite. He presented Eugene Niblack to testify that he had told defendant that transmission by a bite was unlikely. And he offered Dr. Condoluci in an attempt to confirm the low probability of transmission. Dr. Porwancher's opinion was relevant, at least, as an anticipatory rebuttal of one of the defenses.
Finally, we reject defendant's claim that Dr. Porwancher failed to establish a proper foundation for his opinion. The test is whether the sources of the expert's opinion are "of a type reasonably relied upon by experts in the particular field." Evid.R. 56(2). Dr. Porwancher relied on his background as an infectious disease specialist, and on case reports in a leading medical journal, Lancet, and on his own discussions with a Russian doctor at an international conference about his study published in the Soviet Union in 1989 (Journal of Microbiology, Epidemiology and Immobiology) confirming transmissions by bites. Whether these sources and the expert's background were persuasive went to the weight of the opinion, not to its admissibility.

VII
The final point raised by defendant relates to sentencing but is pertinent to the other issues involving HIV and AIDS. *522 Defendant complains that the judge erred in refusing his request to apply the mitigation-of-sentence provision of N.J.S.A. 2C:5-4(b)(1). Under that section, defendant contends, the judge should have sentenced him as if both Count One (first-degree attempted murder) and Count Six (second-degree aggravated assault) were third-degree offenses.
N.J.S.A. 2C:5-4(b)(1) allows a sentencing judge to downgrade a conviction for a criminal attempt:
b. Mitigation. The court may impose sentence for a crime of a lower grade or degree if neither the particular conduct charged nor the defendant presents a public danger warranting the grading provided for such crime under subsection a. because:
(1) The criminal attempt or conspiracy charged is so inherently unlikely to result or culminate in the commission of a crime....
At sentencing, defense counsel asked Judge Mariano to apply this statute to the attempted murder charge by treating it as a second-degree offense. The judge refused:
I also decline to downgrade this offense for sentencing purposes, under the statute that was mentioned by defense counsel.
As I read the statute, the Court should focus on the conduct that was charged and the issue of whether or not this Defendant presents a public danger and also whether or not his conduct was so inherently unlikely to result in a commission of a crime. The conduct in this case was obviously likely to result in a commission of a crime, which is exactly how the statute reads. Whether that would be death from one disease or another, there was ample medical testimony presented by the experts on both sides of this case as to the seriousness of bite injuries from which, rather, can flow a number of virulent infections that be deadly.
In his written statement of reasons, the judge explained his ruling this way:
The Court also refuses to downgrade for sentencing purposes pursuant to 2C:5-4 because the conduct charged clearly could result in the commission of a crime as biting can cause serious and highly virulent life threatening infection, as testified to by the expert witnesses.
The judge added that he was not trying to make any finding as to the medical likelihood that the bite would have succeeded in killing Waddington. Rather, he was simply acknowledging that the jury had found defendant guilty of purposeful criminal conduct, attempted murder, which the Legislature has decreed *523 must be punished as a first-degree offense "even if the ultimate result is not likely to be obtained."
Before addressing the merits of defendant's challenge, we note that we need consider it only with respect to Count One (a first-degree offense, attempted murder), and not, as defendant urges, also as to Count Six (second-degree offense, aggravated assault) for two reasons. At sentencing, defendant made his request with regard to Count One only, asking that it be downgraded to a second-degree crime. On appeal he may not fairly complain that the judge failed to exercise his statutory discretion to downgrade Count Six when defendant did not ask for its downgrade. Defendant also overlooks that the judge merged count six into count one; no separate sentence was imposed on that count. Any failure to downgrade count six alone to a third-degree offense for purposes of sentencing did not harm defendant.
Hence the decision facing us is whether to overturn the judge's refusal to downgrade the attempted murder to either a second-degree offense, as defendant urged at sentencing, or a third-degree offense, as he argues for the first time on appeal, as a matter of original jurisdiction. R. 2:10-3.
The premise of defendant's argument on this point, as on most of his points on appeal, is his claim that no one has ever contracted HIV through a bite. Indeed, he says such transmission has never been proved to be possible. To uphold defendant's 25-year prison term, urges defendant, would be surrender to the "AIDS hysteria" sweeping the country. He also condemns Judge Mariano's allusion to the likelihood that a bite can cause other non-AIDS related but serious conditions. He complains that the judge ignored the AIDS focus of the case and, in any event, his finding was not supported by the medical evidence.
The State responds that N.J.S.A. 2C:5-4(b)(1) is discretionary only and that defendant satisfied both elements for denial of mitigation: "public danger" and likelihood that his conduct *524 would result in "a crime." The State notes that the statute does not demand that the criminal attempt be likely to result in the crime alleged, here murder, but rather only that it be likely to lead to any crime, which in this case it surely did (assault and terroristic threats). Hence the State claims it is irrelevant whether the bite was likely to transmit HIV. The State contends, there was ample evidence at trial, as well as in recent medical studies, that a bite can transmit HIV. Amicus Attorney General sides with the State, appending recent articles and studies purportedly tending to show that HIV transmission through bites is possible.
The evidence on the issue of HIV transmission by a bite came from expert witnesses on both sides. As noted, on behalf of the State, Dr. Porwancher said to a reasonable degree of medical probability, "that it is on rare occasion possible to transmit the virus via a bite injury." In contrast, defendant's expert, Dr. Condoluci, discounted the persuasiveness of the data described by Dr. Porwancher. Based on the two studies in the field, in which none of nine victims of bites by those with HIV became infected with the virus, Dr. Condoluci opined that "there's a very low probability of being infected following a bite wound of an adult as an isolated incident." He conceded that nine case studies were not enough to exclude the possibility of HIV infection via a bite, and he admitted that he would administer a test for HIV to anyone bitten by a carrier of the virus.
The only other evidence concerning the effects of a human bite came from Waddington's treating physician, Dr. Zimmerman, who testified for the State, essentially as a fact witness. Dr. Zimmerman gave Waddington antibiotics and a hepatitis vaccine to combat the effects of the bite. Over defense objections that Dr. Zimmerman was not testifying as an "expert," the doctor was allowed to testify that human bites can cause hepatitis or other infections besides HIV which can be fatal.
*525 We need not, as the judge did not, resolve what defendant asserts is the dispositive issue, namely, whether HIV can be transmitted by a bite. Indeed, from the testimony at trial, the case law, and the medical articles reviewed, we infer that the current state of medical knowledge does not permit a definitive scientific conclusion either way.[2]
*526 But, the mitigation issue is resolvable by the text of N.J.S.A. 2C:5-4(b)(1). The judge was justified in refusing mitigation, regardless of whether the bite was or was not likely to transfer HIV or any other virus to Waddington. The statute allows mitigation as to attempted crimes where the circumstances were such that any "public danger" was negated by the fact that the attempt was "inherently unlikely to result or culminate in the commission of a crime." N.J.S.A. 2C:5-4(b)(1) (emphasis added). The statute does not say that the crime attempted must be inherently unlikely to succeed. The statutory implication is that if defendant's attempt is likely to result in any crime, the judge should not downgrade the offense. If, as here, the charge is attempted murder, but murder actually was unlikely to succeed, the judge still should not downgrade the offense if the attempt was likely to result in some other serious crime, such as an aggravated assault or terroristic threat. Judge Mariano acknowledged this aspect of the statute when he found that defendant's attack on Waddington was likely to result in "a crime," given the evidence that human bites can cause serious injuries or death.
Defendant disputes this "plain language" or literal, textual reading of the statute. He reasons that such an interpretation *527 would render the provision meaningless, in that a defendant appearing for sentencing after a guilty verdict necessarily has been found to have committed a crime. Thus to read the statute literally would mean that a conviction could never be downgraded.
Defendant overlooks the fact that statutory mitigation applies only to crimes of attempt. Hence a verdict of guilty of an attempted offense does not mean that the jury found him guilty of the substantive offense. The purpose of N.J.S.A. 2C:5-4(b)(1) is to acknowledge the varying degrees of danger created by an attempted crime. New Jersey Penal Code, supra, at 148-49. Where the circumstances were such that there was little or no danger, e.g., shooting a gun loaded with blanks, this provision allows a sentencing judge to impose a lesser penalty than would be justified if, for example, the bullets were real but defendant missed. In this case, however, by biting Waddington defendant seriously imperiled Waddington, at least by physically wounding him and emotionally terrorizing him, and at most by placing him at risk of some disease, whether AIDS, hepatitis, or other infection. We cannot say that defendant's conduct was inherently unlikely to result in a crime.
The drafters of our current criminal code adopted the Model Penal Code's solution to this problem. New Jersey Penal Code, supra, at 148-49. Hence N.J.S.A. 2C:5-4(b)(1) substantially mirrors the language of Model Penal Code § 5.05(2), including the reference to "a" crime. In a comment to the mitigation provision, the drafters of the Model Penal Code explained that the provision was needed in order to avoid the harshness of sentencing for an attempted crime when it was impossible or unlikely to succeed. Model Penal Code, supra, § 5.05, commentary at 490-91. The drafters offered the example of an attempt to kill by incantation: while such an attempt is punishable as attempted murder, the judge may downgrade because it could not possibly succeed. Id. at 491.
*528 Another clue to the purpose of mitigation is a comment by one of the Model Penal Code's most eminent drafters, Professor Herbert Wechsler, during the formal proceedings of the American Law Institute:
One of the problems of drafting in this area is that your generalizations are inevitably to encompass the most serious kind of criminality on the one hand, and really trivial business on the other. This is a matter that it is almost impossible to bring to book under any rule formulation.
In order to meet that, we extended the normal power of the court to reduce the grade to the point of permitting the court  in cases where there really is a finding of no danger  to dismiss conspiracy to kill by incantation, hex murders, and so on. These are the provisions that are put to you as destructive of the draft, you see, unless you allow some escape for them. This is the escape we allowed.... [Model Penal Code § 5.05, A.L.I. proceedings at 413-14 (1960).]
While Professor Wechsler's comment is not entitled to conclusive weight, it does corroborate the official commentary's implication that the mitigation provision was intended to permit a lesser sentence "where there really is a finding of no danger." Id. at 414; see Model Penal Code, supra, § 5.05, commentary at 491.
In this case, defendant's attempt did create a real danger. By his hostile remarks and behavior during the biting accident, defendant demonstrated his intent to terrorize and seriously harm Waddington. Even if it were medically undisputable that Waddington could not have contracted HIV or some other virus from the bite, he surely was assaulted. The "attempted murder" was likely to and did result in a crime. The judge did not abuse his discretion by refusing to apply the mitigation statute.
The judge here neither mitigated nor enhanced the presumptive sentence. The judge in the exercise of his discretion declined the State's request to sentence defendant to an enhanced term under N.J.S.A. 2C:44-3. The judge correctly observed that it was "abundantly clear" that defendant's past criminal record (including robbery and burglary convictions) qualified him for an enhanced sentence of 50 years with 25 years parole ineligibility. Thus, the defendant received neither an increased nor a reduced sentence, but the sentence presumed by law.
*529 Defendant further challenges this construction of N.J.S.A. 2C:5-4(b)(1) by relying on this sentence from the Explanatory Note to the Model Penal Code, § 505(2): "The occasions for the exercise of this [mitigation] authority are those in which the actor's conduct is so inherently unlikely to result or culminate in the commission of the crime that neither the conduct nor the actor presents a public danger sufficient to justify the normal application of Subsection (1)." Model Penal Code, supra, § 5.05, at 485.
The problem with defendant's position is that, regardless of the Explanatory Note, which is not part of the statute, the text of the statute itself, in both the Model Penal Code and New Jersey's codification, uses the phrase "a crime." If the drafters intended to say "the crime," they could have and doubtless would have said so. For example, in the definition of the crime of attempt, our Legislature required that there be proof that defendant intended the particular substantive offense being charged, and not just some crime. N.J.S.A. 2C:5-1(a); see New Jersey Penal Code, supra, at 114.
The judge here relied at least in part on evidence that a human bite can cause death from non-AIDS related diseases in denying mitigation. Defendant also attacks this finding as being unsupported. Defendant protests that the judge was wrong when he said that there had been ample expert testimony from both sides that bites can cause serious medical problems other than HIV. Defendant correctly observes that neither party's "expert" witness were asked about or testified to "the transmission of diseases other than AIDS through biting." Only Dr. Zimmerman so testified. Defendant complains that he was a "fact" witness, not an expert. Dr. Zimmerman specialized in family practice, emergency medicine, and acute care for job-related injuries. He was associated with the West Jersey Hospital, held an M.D. degree, and also a Ph.D. in molecular genetics.
*530 Dr. Zimmerman alone treated Waddington for the effects of the bite. In explaining his choice of medicines, he testified without objection that "human bite wounds are notorious for causing very nasty infections and for that reason they're always observed with a great deal of caution." He said that a human bite wound can cause hepatitis. When the prosecutor pursued that topic, defense counsel objected, claiming Dr. Zimmerman was a fact witness who should not be permitted to testify as to "the various ramifications of hepatitis and HIV." The judge overruled the objection, stating: "Well, he's not testifying as an expert, all he's doing is giving the reason why he administered certain treatment because of the number of risks that may be involved in a human bite case. And there's nothing objectionable about that."
Dr. Zimmerman then described the "extremely virulent" nature of bacteria in the mouth, creating a need for antibiotic treatment. Over objection by defense counsel, the doctor testified to the possible consequence of a failure to treat a bite wound: "Potentially the individual could develop a systemic infection and could indeed die from that. There's also the possibility of loss of limb."
On appeal the State and the Attorney General suggest that perhaps a jury could not consider Dr. Zimmerman's testimony as an "expert opinion" on the effects of human bite wounds. But, they argue, that testimony could be considered as a sentencing factor, which is how the judge here treated it. Our courts have held that sentencing judges may consider material that otherwise would not be admissible at trial, as long as it is relevant and trustworthy. State v. Jarbath, 114 N.J. 394, 412 n. 4, 555 A.2d 559 (1989); State v. Davis, 96 N.J. 611, 620-22, 477 A.2d 308 (1984); State v. Carey, 232 N.J. Super. 553, 555, 557 A.2d 1036 (App.Div. 1989).
Defendant counters that this tolerance of inadmissible evidence at the sentencing stage "does not extend to considering the testimony of lay witnesses on subjects which demand expertise *531 and upon which the lay witnesses are not qualified to opine." He invokes the Court's caution in State v. Davis, supra, 96 N.J. at 623, 477 A.2d 308: "[R]elaxed standards for admissibility are not to be equated with automatic admissibility. Judicial tolerance is not judicial license."
Defendant is correct that the judge mistook the record when he said at sentencing that both experts had described the non-HIV related dangers of human bites. The question before us is whether that memory slip was fatal to his refusal to downgrade the offense. We find the error harmless. Even if there was no "expert" evidence that the bite could have resulted in other diseases, defendant's purpose was to commit "a" crime, at the very least, an assault. The judge's discretionary decision not to downgrade is sustainable even without Dr. Zimmerman's testimony.
Even if the judge, based his ruling that the key testimony from Dr. Zimmerman, an alleged "fact" witness, we still find it sustainable on the ground that a sentencing judge may consider evidence which may not have been admissible at trial. Dr. Zimmerman's testimony was plausible, virtually falling within a kind of common knowledge, i.e., that bites can cause infections and serious consequences. It bore the indicia of trustworthiness which courts have required for justification of the relaxed evidentiary standards at sentencing. State v. Carey, supra, 232 N.J. Super. at 555, 557 A.2d 1036. The judge's mistake as to the source of the testimony does not disqualify that testimony as a sentencing factor. And if the doctor was expert enough to treat Waddington's wound, so he was expert enough to discuss its implications before both the judge and the jury.
Affirmed.
NOTES
[1] The Georgia Court of Appeals described the expert testimony as to the lethal potential in quite practical terms:

The expert in this case did not testify that it was impossible to transmit the HIV virus via human saliva, but only that there were no such "documented cases" although there were two "reports" of it. But, he made it clear the disease had come to the forefront of medical attention in much less than ten years and there was a great deficiency of information on the subject. He stated that ... medical uncertainty was such that standard medical procedure was to wear protective gloves when dealing with all bodily fluids of persons, even those not known to be infected with the virus. From the assiduousness of direct and cross-examination by the end of the expert's testimony, the jury could reasonably conclude that it knew about as much as medical science knew at the date of trial, which was not very much, and amounted mostly to what had been so far documented as having occurred, with hardly anything ruled out as "impossible," and with not much by way of conclusion being ventured, except that the disease itself is deadly. The expert testified that the "risk" of transmitting the virus via saliva was somewhat less than the documented risk of transmitting the virus into the blood stream via a needle prick, which was one in 250. From this, we think a reasonable juror could conclude, in common wisdom, that the statistical "risk" of contracting AIDS from an infected person via a needle prick is in actuality a random risk, which alike applies to each and every one of the 250 persons, or to all of them if a large enough theory group is considered, i.e., the total population; and that therefore every needle prick introducing the blood of an infected person is as potentially deadly as the next, and therefore, in the most reasonable common sense of the word, every one is deadly. The same may be said of the supposed much-reduced "risk" of transmitting the virus through saliva.
* * * * * * * *
Most significantly, the expert's testimony showed if an HIV infected person has an open wound, lesion or sore, or gum disease in his mouth through which his blood might be transferred into the blood stream of another, as with a bite, then the victim's risk of contracting the virus is the risk associated with transmittal via the blood, and not of the spittle or sputum. On this basis, the jury could rationally find the risk of transmitting the virus through a human bite rendered appellant's bite a "deadly" weapon, if not his spittle, beyond a reasonable doubt. [Id. at 19-20.]
[2] The Governor's Advisory Council on Aids recently commented on the subject of transmitting AIDS.

The ways in which HIV is transmitted are well documented. HIV can be transmitted through sexual contact; through sharing of contaminated drug injection equipment; during the gestational period or at birth (and possibly through breast feeding); and through exposure to infected blood or blood products (such as through needle stick injuries). Transmission of HIV is the result of certain behaviors. Until we have a vaccine or cure, effective education that reduces risk-prone behavior is our most vital weapon for preventing the spread of HIV infection, AIDS and associated illnesses and health problems. Education campaigns are also essential in the effort to change public perceptions about HIV/AIDS and PLWAs that underlie discrimination against PLWAs, whether overt or covert.
The goal of HIV/AIDS education is to alter attitudes and behavior so that personal conduct is both risk averse and based on scientifically accurate and psychosocially appropriate information. The educational effort should include among its core features: 1) current and valid information about the health and medical aspects of prevention and intervention; 2) sensitivity to the human issues related to HIV and AIDS: and 3) awareness of emerging problems related to HIV and AIDS. [Governor's Advisory Council on Aids, Confronting the Aids Pandemic 21 (December 1992)].
Bleeding in the mouth or gums of the biting assailant could result in exposure to infected blood. Our research discloses a recent Lancet article expressly concerned about exposure to AIDS from reused dental equipment.
Some types of reused dental equipment, especially handpieces and their attachments for drilling and cleaning teeth, might be responsible for cross-contamination if patient material were to lodge temporarily in difficult-to-disinfect internal mechanism. This possibility is worrisome with respect to transmission of hepatitis B and human immunodeficiency viruses (HBV, HIV). Previous cross-contamination studies have relied on laboratory experiments with bacteria or dye tracers. To assess possible risks more thoroughly, we tested 30 new prophylaxis angles and 12 new high-speed handpiece to see whether they would take up and expel contaminants in laboratory and clinical trials.
* * * * * * * *
We recommend that reused high-speed, air-driven handpieces and prophylaxis angles should be cleaned and heat-treated between patients. Further studies are needed to determine ways of eliminating the risks associated with exhaust hoses and air/water input lines. [Lewis, Arens, "Cross-Contamination potential with dental equipment," 340 The Lancet 1252 (November 21, 1992).]
A recent documented study concludes that "the potential for salivary transmission [of HIV] exists." Yasuhiro Goto et al., "Detection of Proviral Sequences in Saliva of Patients Infected with Human Immunodeficiency Virus Type 1," 7 Aids Research and Human Retroviruses 343, 346 (1991); see also American Dental Ass'n v. Martin, 984 F.2d 823, 827 (7th Cir. 1993) (approved strict OSHA standards for dental workers based on infectious HIV potential from blood in saliva).